Argued and submitted September 4, judgment of the circuit court affirmed
September 5, 1996

Reverend F. Wayne BRYANT,
Reverend Jon B. Buffington,
Reverend Gary Davis, Reverend John Dennis,
Reverend Charles F. Falconer,
Reverend Dr. Myron M. Hall,
Ellen C. Lowe, Reverend Dr. Mark Reid,
Rabbi Emanuel Rose, Reverend Elwin Schwab,
Reverend Dr. Marilyn Sewell,
Elder Murray J. Smith,
Reverend Kenneth D. Steiner, and
Reverend Paul R. Swanson,
*Appellants,*

*v.*

S. Frank THOMPSON,
Superintendent of the
Oregon State Penitentiary,
and State of Oregon,
*Respondents.*

(CC 96C12828; SC S43560)

922 P2d 1219

Charles F. Hinkle, Portland, in behalf of the ACLU Foundation of Oregon, Inc., and Stephen Kanter, Portland, in behalf of Lewis & Clark Legal Clinic and the ACLU Foundation of Oregon, Inc., argued the cause and filed the brief for appellants.

Virginia L. Linder, Solicitor General, Salem, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, and Rives Kistler, Robert B. Rocklin, and Janet A. Metcalf, Assistant Attorneys General, Salem.

Before Carson, Chief Justice, Gillette, Van Hoomissen, Fadeley, Graber, and Durham, Justices, and De Muniz, Justice pro tempore.

CARSON, C. J.

Fadeley, J., filed a specially concurring opinion.

## CARSON, C. J.

On March 21, 1996, this court issued an opinion affirming Douglas Franklin Wright's convictions on eight counts of aggravated murder and affirming the sentence of death imposed upon him. *State v. Wright*, 323 Or 8, 913 P2d 321 (1996). After the period for reconsideration of that decision had passed without the filing of a petition for reconsideration, the appellate judgment issued on May 3, 1996. Wright was represented by counsel throughout the appellate process before this court. No petition for *certiorari* has been filed with the United States Supreme Court.

On June 6, 1996, in the Circuit Court for Wasco County, the judge who had presided over Wright's aggravated murder trial conducted a proceeding that concluded with the issuance that day of a "death warrant," pursuant to ORS 137.463(2).[1] That warrant provides that the sentence of death shall be carried out on September 6, 1996. Before issuing the death warrant, the judge concluded that Wright "currently is legally sane for purposes of being executed" and that Wright "voluntarily, knowingly, and intelligently has waived his right to counsel for this death warrant proceeding."

On August 22, 1996, the case at issue here was filed in the Circuit Court for Marion County. The complaint is for a declaratory judgment and injunctive relief. Plaintiffs are citizens, residents, and taxpayers of the State of Oregon. Defendants are the State of Oregon and the Superintendent of the Oregon State Penitentiary.

Plaintiffs' claim relies upon Article I, section 10, of the Oregon Constitution, which requires, in part, that "justice shall be administered * * * completely." Plaintiffs assert that the state constitution thereby mandates, at a minimum,

---

[1] ORS 137.463(2) provides:

"If the Supreme Court affirms the sentence of death, a warrant, signed by the trial judge of the court in which the judgment was rendered and attested by the clerk of that court, shall be drawn and delivered to the Superintendent of the Oregon State Penitentiary. The warrant shall appoint a day on which the judgment is to be executed and shall authorize and command the superintendent to execute the judgment of the court."

that post-conviction proceedings must be litigated to a conclusion before the state may execute a person.[2] Plaintiffs further assert that this constitutional command is not an individual right but, rather, an institutional mandate. From that premise, plaintiffs assert that an individual defendant cannot forego or waive the necessity for the post-conviction relief proceeding and that any individual citizen has standing to file an action to require the state to fulfill its constitutional obligation to conduct such a post-conviction proceeding.

The parties appeared before the Circuit Court for Marion County on August 28, 1996. The court concluded that plaintiffs have failed to join Wright, an indispensable and necessary party, that plaintiffs lack standing, and that plaintiffs are wrong in asserting that Article I, section 10, is a constitutional barrier to carrying out the death sentence on September 6. The circuit court thereupon entered judgment for defendants on August 28, and plaintiffs filed a notice of appeal in the Court of Appeals the same day. The Court of Appeals certified the appeal to this court by order entered on August 29, and this court accepted the certified appeal on August 30. *See* ORS 19.210 and ORAP 10.10 (describing certification procedure).

Simply stated, plaintiffs contend that Article I, section 10, requires that a post-conviction or comparable proceeding occur before a sentence of death may be carried out. If they are correct, the trial court erred; if they are incorrect, the trial court's judgment must be affirmed.

Plaintiffs' claim to standing here is based upon the underlying assertion that Article I, section 10, itself gives them the right to seek a declaration of its construction and application. If that were so, then plaintiffs would qualify as persons whose "rights, status or other legal relations are affected by a constitution," under the standing provision, ORS 28.020, of Oregon's Uniform Declaratory Judgments

---

[2] Post-conviction relief is a collateral civil proceeding, available to a convicted criminal defendant to challenge the validity of his or her conviction upon certain grounds that could not have been asserted in the statutory direct appeal. *See* ORS 138.510 *et seq* (the Post-Conviction Hearing Act). *See also Palmer v. State of Oregon*, 318 Or 352, 867 P2d 1368 (1994) (discussing post-conviction procedures).

Act.[3] Consequently, both the questions of standing and the merits of plaintiffs' claim present issues of constitutional interpretation under Article I, section 10.

■ Ordinarily, we would examine the question of plaintiffs' standing as a threshold issue before considering the merits of plaintiffs' claim. In this case, however, the questions of standing and the merits are intertwined, and the resolution of the merits of plaintiffs' claim permits us to assume *arguendo*, without deciding, that they have standing to bring the claim. We proceed, accordingly, to consider whether the requirement under Article I, section 10, of the Oregon Constitution, that "justice shall be administered * * * completely" mandates the litigation of a post-conviction relief action in every death penalty case.

The source of plaintiffs' argument is *State v. Martini*, 144 NJ 603, 677 A2d 1106 (1996). In that recent decision, the New Jersey Supreme Court held that the New Jersey state constitution requires that a post-conviction review be held in every death penalty case, whether or not the convicted criminal defendant wishes to pursue that remedy. The *Martini* decision is not based upon a state constitutional provision that is textually or otherwise similar to Article I, section 10, of the Oregon Constitution. Therefore, we do not find the case pertinent or persuasive to our interpretation of the relevant provisions of the Oregon Constitution, to which we now turn.

■ To interpret a provision of the Oregon Constitution, the court considers "[i]ts specific wording, the case law surrounding it, and the historical circumstances that led to its creation." *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992). Article I, section 10, of the Oregon Constitution, states:

"No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

---

[3] ORS 28.020 provides, in part, that "[a]ny person * * * whose rights, status or other legal relations are affected by a constitution" may seek a declaratory judgment.

The text on which plaintiffs rely does not require that any particular proceeding be had in a death penalty case.

Case law provides some insight into the meaning of Article I, section 10, in this context. In *State v. Wagner*, 305 Or 115, 146, 752 P2d 1136 (1988), *vacated on other grounds* 498 US 879, 111 S Ct 212, 106 L Ed 2d 583 (1989), *rev'd in part on other grounds* 309 Or 5, 786 P2d 93 (1990), the defendant argued that the Oregon death penalty statutes violate the command of Article I, section 10, that "justice shall be administered * * * completely." This court responded:

> "[Article I, s]ection 40[, providing for the death penalty] and the statutes to implement it were duly enacted by an overwhelming majority of the people of this state. If defendant received a trial and sentence according to those and other applicable laws, he received 'justice,' for *justice is received if judgment is given according to the law*. A law itself may be unjust, as the opponents of capital punishment believe our present law to be, but unjust and injustice are two different things." (Emphasis added.)

Nothing in the case law suggests that Article I, section 10, mandates the litigation of a post-conviction relief action in a death penalty case.

We turn to an examination of the history of Article I, section 10.[4] Article I, section 10, derives from a combination of Article 40 of the Magna Carta (1215), and Lord Edward Coke's commentary on the Magna Carta, *The Second Part of the Institutes of the Lawes of England* (1642) (*Second Institutes*). Written to reform the system of selling writs, practiced during the reign of Henry II and his son, King John, Article 40 of the Magna Carta states: "To none will we sell, to none deny or defer, right and justice." Those words are a source of the "justice without delay clause" and the guarantee that "no court shall be secret."

---

[4] Our understanding of the history of Article I, section, 10, has been greatly assisted by the following law review articles: Jonathan Hoffman, *By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions*, 74 Or L Rev 1279 (1995); David Schuman, *The Right to a Remedy*, 65 Temple L Rev 1197 (1992); and David Schuman, *Oregon's Remedy Guarantee: Article I, Section 10 of the Oregon Constitution*, 65 Or L Rev 35 (1986).

Lord Coke's expansion of the Magna Carta concepts, in the *Second Institutes*, added the idea of "complete justice." Explaining Article 40, he wrote:

> "And therefore every Subject of this Realm, for injury done to him in *bonis, terris, vel persona* [*i.e.*, goods, lands, or person], by any other Subject, be he Ecclesiastical, or Temporal, Free or Bond, Man or Woman, Old or Young, or be he outlawed, excommunicated, or any other without exception, may take his remedy by the course of the Law, and have justice and right for the injury done him, freely without sale, fully without any denial, and speedily without delay.

> "Hereby it appeareth, that Justice must have three qualities, it must be Libera, quia nihil iniquius venali Justitia; Plena, quia Justitia non debit claudicare; & Celeris, quia dilatio est quaedam negatio; and then it is both Justice and Right."

The Latin translates: "free, for nothing is more iniquitous than justice for sale; complete, for justice should not do things by halves; swift, for justice delayed is justice denied."[5]

Lord Coke in his writing and his work fought against royal interference with the common-law courts. Over 100 years later, American colonists turned to Coke's writings as ammunition for their fight against the Crown's interference in colonial common-law courts.

Coke wrote the *Second Institutes* to justify the judiciary's independence from the Crown. He fought against the sale of common-law justice through corruption and against the denial and delay of justice through external interference with the courts by the King and his ministers. During Coke's era, the King would consult with judges on pending cases and stop or delay proceedings pending in common-law courts.

Similarly, in colonial America, lawyers considered the integrity of their courts to be threatened by improper political pressure. The Crown interfered in the colonial judiciary by controlling the payment of judges and insisting on the right to remove colonial judges at will. Beginning with the Stamp Act, in 1765, the Crown actively hampered the administration of justice by the colonial courts.

---

[5] Schuman, *Oregon's Remedy Guarantee*, 65 Or L Rev at 38 n 19.

The colonists were familiar with the Magna Carta and the *Second Institutes* and, when it came time to write their own laws, they looked to those documents, mindful of the perils of allowing external interference with the courts. A few months after the signing of the Declaration of Independence, Delaware adopted the Declaration of Rights and Fundamental Rules of Delaware State. Article XII of the Delaware Declaration incorporated the by-then familiar concepts of free and equal justice, stating:

> "That every freeman for every injury done him in his goods, lands or person, by any other person, ought to have remedy by the course of the law of the land, and ought to have justice and right for the injury done to him freely without sale, fully without any denial, and speedily without delay, according to the law of the land."

In Pennsylvania's 1790 constitution, the phrase "fully without any denial" became "without sale, denial, or delay." The inclusion of such phrasing was intended to promote and protect an independent judiciary, much as it was in Coke's era.

Article I, section 10, arose out of the foregoing history. From all the foregoing materials, we conclude that Article I, section 10, does not, by itself, mandate the litigation of an action for post-conviction relief in every death penalty case.

Another provision of the Oregon Constitution lends support to our conclusion about the meaning of Article I, section 10, in this context—that is, in the context of an assertion that some form of post-conviction review must occur in death penalty cases for a court to consider claims (such as constitutionally inadequate counsel) that could not be raised on direct appeal. That constitutional provision is Article I, section 23, which provides:

> "The privilege of the writ of habeas corpus shall not be suspended unless in case of rebellion, or invasion the public safety require it."

As we have explained, plaintiffs' theory on the merits is that the state must conduct post-conviction review before a person may be executed. But the statutory right to post-conviction relief derives from Article I, section 23:

"The institution of habeas corpus consists of the power of the courts to inquire into the legality of a detention. * * *

"In Oregon, the writ of habeas corpus is intended to allow a detained person the opportunity to inquire into the legality of that detention, with a view to an order releasing the petitioner."

*Bartz v. State of Oregon*, 314 Or 353, 364-65, 839 P2d 217 (1992). The Post-Conviction Hearing Act is a statutory substitute for habeas corpus with respect to the substantive grounds set out therein. *Id.* at 362-64. Nonetheless, Article I, section 23, is the provision that defines the extent of the state constitutional right to collateral review of a criminal conviction or sentence, whether the form be common law or statutory.

The text of Article I, section 23, does not suggest that collateral review of a criminal conviction or sentence is mandatory and nonwaivable in a death penalty case. To the contrary, the word "privilege" indicates that the right to seek habeas corpus relief is personal, rather than being an obligatory part of the criminal process.

Case law similarly suggests that the right to seek habeas corpus relief is personal and not obligatory. In *Bartz*, this court explained that the writ of habeas corpus guaranteed in Article I, section 23, "is intended to *allow a detained person the opportunity* to inquire into the legality of that detention." 314 Or at 365 (emphasis added). The court held in *Bartz* that the constitutional requirement that habeas corpus not be suspended is satisfied so long as the process for seeking collateral review is available for "persons who seek redress" and that the imposition of a 120-day time limitation did not impermissibly suspend the writ in violation of Article I, section 23. *Id.* at 366. *See generally Peyton v. Rowe*, 391 US 54, 58, 88 S Ct 1549, 20 L Ed 2d 426 (1968) (suggesting that the writ of habeas corpus is one of right rather than one of course).

Neither does history support a suggestion that collateral review of a criminal conviction or sentence is mandatory and nonwaivable. Standing to bring a habeas corpus action historically has been limited to the affected individual or an individual who can file the action as a "next-friend" in

behalf of the affected individual.[6] In *Whitmore v. Arkansas*, 495 US 149, 162-64, 110 S Ct 1717, 109 L Ed 2d 135 (1990), for example, the Supreme Court stated that the federal habeas corpus statute, 28 USC § 2242 (providing that an application for habeas corpus shall be "by the person for whose relief it is intended or by someone acting in his behalf"), codified the historical practice for the writ. *Cf.* ORS 34.340 (providing that the state writ of habeas corpus "shall be allowed by the court or judge thereof upon the petition of the party for whose relief it is intended, or of some other person in behalf of the party"). There is nothing about the historical concepts of individual standing or next-friend standing that suggests that one can find in habeas corpus a mandatory and institutional, nonpersonal and nonwaivable, duty to apply the writ.

■       It follows from the foregoing that, if the remedy is not sought by a person to whom the right belongs, the state constitution does not require that the judicial system conduct some sort of proceeding, either *sua sponte* or at the behest of a third party who is not connected with a person to whom the right belongs. Article I, section 10, when read in connection with Article I, section 23, does not mandate the litigation of an action for post-conviction relief in every death penalty case.

In view of our disposition on the merits, we need not decide the remaining assignments of error.

In conclusion, plaintiffs are not entitled to the declaratory judgment and injunctive relief that they seek. It follows that the trial court did not err in dismissing their case.

The judgment of the circuit court is affirmed.

**FADELEY, J.,** specially concurring.

The Solicitor General argued for the government of this state on September 4 that the condemned has a right to

---

[6] "Next-friend" standing generally requires a significant relationship to the affected individual and a showing that that individual is unable to proceed in his or her own behalf. *See Whitmore v. Arkansas*, 495 US 149, 163-64, 110 S Ct 1717, 109 L Ed 2d 135 (1990) (explaining concept).

die, as we are secondarily informed that he desires to do. The Solicitor General also argued that those who find that the government's assisting him to do so is repugnant have no legal basis to interfere with that right where he was condemned legally.

Those among our citizenry who wish him a reformed life rather than a retributive death have done their best, but they are not the condemned. They have succeeded only in demonstrating that a process designed to correct constitutionally erroneous sentences is available under our law, but has not been invoked by the only person who could do so. He has not attempted or completed that process.

The condemned judges himself to be evil; he desires death at the hands of the government for his terrible crimes. He does not join in the efforts to have his death sentence process reviewed for fundamental, prejudicial legal errors. Saying that is sufficient to answer the citizens seeking to avert an "erroneous" execution. This is not the time, nor was this case contested between real parties in interest sufficiently to permit, a constitutional interpretation of an age-old guarantee about the judicial system, a guarantee of independence of the courts from the other holders of governmental power. That guarantee, Article I, section 10, of the Oregon Constitution, which has been improved and maintained over the centuries, was erected so that courts can protect individual's lives, property, and religious and political activities from the other holders of governmental power.

All that is necessary is that the court do nothing, because the condemned has brought no real case before it. Because that choice by the court would not be legally wrong, I join in the disposition of this case. I find it unnecessary, therefore, and also unwise in this case, to consider the merits of the other issues to which the majority speaks.