Argued and submitted March 6, 1995, sentence of death affirmed
November 21, 1996

# STATE OF OREGON,
*Respondent,*

*v.*

# MARCO ANTONIO MONTEZ, II,
*Appellant.*

## (CC C870834702; SC S39670)

927 P2d 64

──────────

John P. Daugirda, Eugene, argued the cause and filed the briefs for appellant. Appellant filed a supplemental brief *pro se*.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Richard D. Wasserman, Assistant Attorney General.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Graber, and Durham, Justices.**

DURHAM, J.

Fadeley, J., dissented and filed an opinion.

──────────
** Unis, J., retired June 30, 1996, and did not participate in this decision.

## DURHAM, J.

This case is before us for the second time on automatic and direct review of a sentence of death. ORS 163.150(1)(g). In 1988, a jury found that defendant had committed aggravated murder and related offenses, and he was sentenced to death.[1] The crimes occurred on June 21, 1987. This court affirmed defendant's convictions but vacated his sentence on the basis of *State v. Wagner*, 309 Or 5, 14-20, 786 P2d 93, *cert den* 498 US 879 (1990) (*Wagner II*).[2] *State v. Montez*, 309 Or 564, 789 P2d 1352 (1990) (*Montez I*).

On remand, the trial court empaneled a new sentencing jury. The court instructed the jury to answer the following questions:

1. "Was the conduct of the defendant that caused the death of the deceased committed deliberately and with a reasonable expectation that death would result?"

2. "Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?"

---

[1] The facts underlying defendant's convictions are set forth in *State v. Montez*, 309 Or 564, 567-69, 789 P2d 1352 (1990) (*Montez I*).

[2] In *Wagner II*, this court held that, in the light of *Penry v. Lynaugh*, 492 US 302, 109 S Ct 2934, 106 L Ed 2d 256 (1989), the federal constitution requires that the sentencing jury in a capital case be given an effective opportunity to consider all aspects of a defendant's life and crime in determining the appropriate sentence. 309 Or at 7. To satisfy that requirement, this court held that the trial court should instruct the jury to answer a "fourth question, in response to which the sentencing jury may spare a defendant from the death penalty, notwithstanding an affirmative finding on the issues listed in subsection (1)(b) of the statute." *Id.* at 16. In 1991, the legislature amended ORS 163.150(1)(b)(D) to codify this court's statement of the fourth question in *Wagner II*. Or Laws 1991, ch 885, § 2. ORS 163.150(1)(b) now provides:

"Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) Whether the defendant should receive a death sentence."

3. "Should the defendant receive the death sentence, you should answer this question no if you find that there is any aspect of the defendant's character or background or any circumstances of the offense that you believe would justify a sentence less than death."[3]

The jury answered those questions in the affirmative and, pursuant to ORS 163.150(1)(f),[4] the trial judge imposed a sentence of death.

Defendant requests that this court vacate his death sentence and raises 10 assignments of error. We conclude that none of defendant's assignments of error has merit and, accordingly, affirm the sentence of death.[5] We consider defendant's subconstitutional arguments before his constitutional ones.

---

[3] Because defendant made no claim of provocation by the victim, no question regarding provocation was submitted to the jury. Accordingly, what we referred to as the "fourth question" in *Wagner II* is, in this case, the third question, *i.e.*, whether the defendant should receive a death sentence. In this opinion, we continue to refer to that question as the "fourth question" because of its placement in the statute, Or Laws 1991, ch 885, § 2. In regard to the fourth question, this 1987 murder is controlled by ORS 163.150(1)(b) (1985) and *Wagner II*, not the 1991 statute.

[4] ORS 163.150(1)(f) provides:

"If the jury returns an affirmative finding on each issue considered under paragraph (b) of this subsection, the trial judge shall sentence the defendant to death."

[5] The author of this opinion, speaking for himself alone, joins the majority's disposition for the additional reason expressed below. It is elementary that defendant must be sentenced "under the sentencing provisions in force at the time that the murder was committed." *State v. Langley*, 318 Or 28, 32, 861 P2d 1012 (1993). When defendant committed his crime in 1987, ORS 163.150(1)(b) (1985) was in force. That statute required the court, in a prosecution for aggravated murder, to sentence the defendant to death if the jury answered affirmatively three questions about the circumstances of the murder.

In *Penry*, 492 US at 328, the United States Supreme Court held that a Texas statute, which was materially indistinguishable from Oregon's, was constitutionally infirm and, thus, did not authorize a lawful death sentence because the statute compelled entry of a death sentence without requiring the factfinder to consider possible mitigating circumstances surrounding the murder. *Penry* dictates the conclusion that ORS 163.150(1)(b) (1985) likewise is unconstitutional and that, in 1987, Oregon had enacted no *valid* statute authorizing a death sentence.

In *Wagner II*, a majority of this court evaded that conclusion by purporting to construe ORS 163.150(1)(b) (1985) to require the court to impose a death sentence despite the statute's constitutional defect. According to the *Wagner II* majority, although the 1985 statute mandated a death sentence if the jury answered three questions that did not mention mitigating circumstances, nevertheless the court would uphold a death sentence if the jury answered negatively a fourth question

## I. APPLICATION OF THE OREGON EVIDENCE CODE

■ Defendant contends that the trial court erred in denying his motion to declare the Oregon Evidence Code (OEC) applicable to the second penalty-phase proceeding. *See State v. Stevens*, 319 Or 573, 580, 879 P2d 162 (1994) ("The standard of relevance set forth in OEC 401 applies in penalty-phase proceedings."). Defendant contends that, during the first trial of this case, the state stipulated that the OEC would apply to the penalty-phase proceeding. Defendant further asserts that, because the second penalty-phase proceeding was a continuation of the first trial, the state is bound by that stipulation in the second penalty-phase proceeding.

 Defendant also argues that the trial court's prior approval of the application of the OEC to the penalty phase constituted the law of the case, as articulated in *State v. Pratt*, 316 Or 561, 569, 853 P2d 827 (1993), *quoting Simmons v. Wash. F. N. Ins. Co.*, 140 Or 164, 166, 13 P2d 366 (1932):

> " 'It is a general principle of law and one well recognized in this state that when a ruling or decision has been once made in a particular case by an appellate court, while it may be overruled in other cases, it is binding and conclusive both upon the inferior court in any further steps or proceedings in the same litigation and upon the appellate court itself in any subsequent appeal or other proceeding for review.' "

about mitigation that the court expressed for the first time in its *Wagner II* opinion in 1990.

In the author's view, the court should reconsider *Wagner II*. That opinion violates the court's judicial responsibility by fundamentally altering the text and function of Oregon's death penalty statute under the guise of interpreting it. Moreover, the 1990 reformation of the death penalty statute represented by the *Wagner II* opinion cannot apply retroactively to murders committed before that date under the rule expressed in *State v. Langley. Wagner II*, 309 Or at 32 (Linde, J., dissenting) ("[B]ecause the 1984 penalty provisions were not valid, no death penalty could validly be applied under those provisions. If this court had correctly so decided in 1988, would anyone maintain that the legislature in 1989 could have provided for resentencing this defendant to death under a new, revised statute? The answer must be no.").

The author previously has expressed his view that *Wagner II* should be reconsidered. *See State v. Pinnell*, 319 Or 438, 449, 887 P2d 635 (1994) (Durham, J., dissenting). He adheres to that view. However, four members of this court continue to adhere to the majority opinion in *Wagner II*. As a result, repetition of the author's view would not alter this case's disposition or serve any other useful function. For that reason, the author concurs in affirming the trial court's judgment.

Assuming *arguendo*, without deciding, that the state is bound by an earlier agreement to abide by the OEC and that the trial court's approval did constitute the law of the case, defendant has not demonstrated that any prejudice resulted from the trial court's ruling. Defendant argues that he was prejudiced because the trial court admitted "other crimes and other bad act evidence which should have been excluded under the balancing of OEC 403 and as inadmissible hearsay under the evidence code." However, defendant has not identified any evidence, admitted by the trial court, that the OEC makes inadmissible. Defendant's assignment of error, therefore, is not well taken.

## II. ADMISSION OF EVIDENCE

■ Defendant argues that the trial court improperly admitted certain evidence during his second penalty-phase proceeding. First, defendant argues that the trial court erred in permitting the state to introduce evidence that the state had introduced previously in the guilt-phase proceeding. Defendant asserts that the trial court erred in admitting that evidence in the second penalty-phase proceeding because the evidence was repetitive and subject to exclusion under ORS 163.150(1)(a), which provides as material:

"Upon a finding that the defendant is guilty of aggravated murder, the court * * * shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to life imprisonment * * * or death. * * * In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence * * *; *however, neither the state nor the defendant shall be allowed to introduce repetitive evidence that has previously been offered and received during the trial on the issue of guilt.*" (Emphasis added.)

The state responds that the provision does not apply if a second penalty-phase proceeding is held on remand and the newly empaneled sentencing jury did not participate in the guilt-phase proceeding of the original trial. We agree with the state's interpretation of the statute.

The emphasized text contemplates that the same jury that determined the defendant's guilt also will determine the defendant's sentence. In a typical case, the penalty-phase proceeding is simply a part of the trial to which the

defendant is entitled. The statute prohibits the parties from introducing "repetitive" evidence in the penalty-phase proceeding that already has been presented to the jury during the guilt-phase proceeding. However, that is not the case when, as here, the court empanels a new jury on retrial after a reversal of an earlier death sentence. In that context, because the newly empaneled jury did not sit through the earlier guilt-phase proceeding, the jury has not heard or considered any evidence introduced during that phase. As to that jury, evidence introduced in the second penalty-phase proceeding is not "repetitive" within the meaning of the statute. We conclude that the trial court did not err in permitting the state, during the second penalty-phase proceeding before a newly empaneled jury, to introduce evidence that the state had introduced previously during the guilt-phase proceeding.

■ Second, defendant argues that the trial court erred in permitting the state to introduce certain exhibits that the court had admitted previously during the guilt-phase proceeding, because the state offered those exhibits in an altered form in the second penalty-phase proceeding. Defendant argues that the alterations were calculated to inflame and prejudice the jury and that the trial court should have required the state to reintroduce the exhibits in the same form in which the state had offered them during the guilt-phase proceeding.

Defendant does not cite any authority, and we are aware of none, that precludes the state from introducing exhibits in a different form in a second penalty-phase proceeding in a capital case. Moreover, we are unpersuaded that defendant suffered any prejudice as a consequence of the admission of the challenged exhibits. Accordingly, we reject defendant's argument.

■ Third, defendant argues that the exhibits were inadmissible because the state had removed them from the chain of custody. In this case, the state offered exhibits at the first trial and reclaimed them after that trial. The exhibits remained continuously in the state's possession until the state offered them at retrial. Defendant does not contend that anyone tampered with the exhibits during that period. Under the circumstances, we conclude that the trial court did not

abuse its discretion in admitting the exhibits, because there was no gap in the chain of custody.

We have considered defendant's remaining claims pertaining to the introduction of the exhibits and conclude that those claims are not well taken.

## III. ISSUES REGARDING JURY SPECULATION

Defendant argues that, during the second penalty-phase proceeding, the court took several actions that caused the jury to speculate about the possibility that the state would place defendant on parole if the jury sentenced him to life imprisonment. From that premise, he concludes that, in order to avoid the possible result of a sentence less than death, the jury imposed the death penalty. We consider each of his specific arguments.

Defendant argues that the trial court erred by allowing the state to introduce evidence concerning his prior performance on probation and parole. Defendant argues that the evidence was irrelevant under OEC 401[6] and was unfairly prejudicial, confusing, and misleading under OEC 403[7] as to the second question, *i.e.*, future dangerousness and, in addition, was irrelevant to the jury's determination of the fourth question, *i.e.*, whether defendant should receive the death penalty. The trial court disagreed with the latter argument. Defendant asserts that the state offered the evidence to encourage the jury to ensure that defendant would not be paroled in the future by imposing the death penalty and, therefore, that the trial court should have excluded the evidence. Defendant relies primarily on *State v. Douglas*, 310 Or

---

[6] OEC 401 provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

In *State v. Stevens*, 319 Or 573, 580, 879 P2d 162 (1994), this court held that "[t]he standard of relevance set forth in OEC 401 applies in penalty phase proceedings."

[7] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

438, 800 P2d 288 (1990), and *State v. Smith*, 310 Or 1, 791 P2d 836 (1990).

According to the state, the disputed evidence is relevant to the second question, because it tends to establish defendant's disregard for, or inability to conform to, strict rules of behavior, even when defendant knows that his behavior is being monitored closely. The state argues that a jury rationally could conclude from such evidence that defendant likely will continue to be a danger to society even while incarcerated.

■ We first address defendant's arguments with respect to the second question, *i.e.*, future dangerousness. If the challenged evidence is admissible in connection with that issue, we need not decide whether the trial court erred in concluding that the evidence is relevant with respect to the fourth question, *i.e.*, whether defendant should receive the death penalty.

In *Douglas*, this court considered whether, in a proceeding under ORS 163.150 (1987), it was proper for a trial court to instruct the jury on the possible release of persons sentenced to life imprisonment.[8] 310 Or at 447. In that case, the defendant contended that the instruction given was improper because it invited the jury to speculate about the possibility of parole. The state responded that "the challenged instruction is relevant to the jury's assessment of future dangerousness." *Id.* at 449. This court rejected the state's argument, in part on the basis of its prior rulings that "society," for purposes of the "future dangerousness" inquiry, "includes prison society, as well as society at large." *Id.* at 450. This court noted that, "[w]hen the jury considers the

---

[8] ORS 163.150 (1985) applies to this case, because defendant committed the murder in June of 1987, before the effective date of the 1987 statute. However, this court's discussion in 1990 in *Douglas* of the propriety of an instruction on the possible release of persons sentenced to life imprisonment is equally applicable to a proceeding under ORS 163.150 (1985) because, under both the 1985 and the 1987 versions of the statute, the sentencing option of life imprisonment without possibility of parole or release was unavailable. ORS 163.150 was amended in 1989 to add the sentencing option of life imprisonment without the possibility of release or parole. Or Laws 1989, ch 720, § 2.

threat that the defendant might pose because of future violent crimes, it may consider the threat to prison society." *Ibid.*

In *Smith*, this court addressed testimony that referred to a prisoner's early release from prison. 310 Or at 17-18, 26. In that case, in response to defense counsel's attempt to show that the state's witness had received a reduction in sentence in exchange for information about the defendant, the state called as a witness a supervisor for the Oregon State Corrections Division Parole and Probation office. *Id.* at 16-17. The supervisor discussed how the actual time of incarceration is determined by a prisoner's position in the state's matrix system and not by the length of the sentence imposed by the judge. *Id.* at 17.

This court held that the supervisor's testimony about the matrix system and early release was relevant to the issue of the state's witness' credibility and to the issue of whether the state's witness had a "deal" with the state. *Id.* at 18. The court said that the remote possibility that the jury would take the evidence into consideration in deciding the defendant's guilt or sentence was rendered even more unlikely by the trial court's instruction to consider the supervisor's testimony only for the purpose of assessing the credibility of the state's witness. *Ibid.* This court held that the trial court had not erred in concluding that the probative value of the supervisor's testimony was not "substantially outweighed" by the "danger of unfair prejudice, confusion of the issues, or misleading the jury." *Ibid.*

Also in *Smith*, the state referred to release from prison in its closing argument, stating that a prisoner may be paroled. *Id.* at 22. Defense counsel objected to that reference. The trial court sustained the objection and instructed the jury not to consider or discuss the remarks. *Ibid.* This court held that the curative instruction was sufficient, because jurors are presumed to follow their instructions. *Id.* at 26.

Defendant argues that *Douglas* and *Smith* stand for two principles: First, evidence and argument about whether an aggravated murderer will be released under a "life with parole" statute is irrelevant because future dangerousness directed at society includes prison society as well as society at

large. Second, an instruction on the possible release of persons sentenced to life imprisonment with the possibility of parole is improper in the absence of evidence making it relevant.

The state notes that this court's discussion of the parole issue in *Douglas* demonstrates concern only about giving the jury an instruction on the parole process. The state correctly argues that *Douglas* does not hold that otherwise admissible evidence of a defendant's prior poor performance on probation or parole always is irrelevant.

This court consistently has held that evidence of a defendant's bad acts, including unadjudicated bad acts, is admissible in the penalty-phase because such evidence is relevant to the defendant's future dangerousness. *Smith*, 310 Or at 29; *State v. Moen*, 309 Or 45, 73, 786 P2d 111 (1990); *Montez I*, 309 Or at 610-11; *State v. Farrar*, 309 Or 132, 174-75, 786 P2d 161 (1990); *State v. Wagner*, 305 Or 115, 178, 752 P2d 1136 (1988) (*Wagner I*), *judgment vacated and remanded on other grounds* 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989). Evidence of defendant's prior early release from prison is not relevant to the issue of defendant's future dangerousness because it is not a prior bad act. However, evidence that defendant violated the conditions of his parole is relevant because it tends to show that defendant will continue to engage in unlawful behavior even when in a structured environment, such as a prison. *See Douglas*, 310 Or at 450 (when considering defendant's future dangerousness, the jury may consider the threat to prison society as well as the threat to society outside prison). We conclude that evidence of defendant's parole violations is relevant to the jury's deliberation on the subject of future dangerousness.

Defendant also argues that the trial court should have excluded the same evidence as unduly prejudicial and misleading under OEC 403 because it encouraged the jurors to speculate about the possibility that defendant might be paroled again if sentenced to life imprisonment and, consequently, may have persuaded the jurors to vote for the death sentence to prevent that possibility. Although there is a remote possibility that evidence of defendant's prior parole may have caused the jury to speculate that defendant might

obtain early release from a life sentence, that possibility is so remote that the danger of undue prejudice arising from that evidence does not "substantially outweigh" its probative value. OEC 403. The evidence was properly admitted.

## IV. ADMISSION OF IMPEACHMENT EVIDENCE

Defendant contends that the trial court erred in allowing the state to elicit testimony from defendant's character witnesses concerning the circumstances of their prior early releases from prison, their present parole release dates, and the circumstances of their past escapes and attempted escapes from prison. Defendant argues that this evidence was not relevant under OEC 401 and was unfairly prejudicial, confusing, and misleading under OEC 403. Defendant further asserts that the evidence was calculated to inflame the jurors and to cause them to vote for the death penalty to ensure that defendant would not escape or be paroled in the future.

During trial, defendant called a number of his fellow inmates to testify on his behalf as character witnesses. One of those witnesses, death row inmate Langley, testified on direct examination about conditions on death row and about defendant's character and good behavior while in prison. The state cross-examined Langley about his prior convictions and early releases from prison:

"Q. Mr. Langley, your burglary convictions, how many?

"A. I would say as an adult, I was convicted of at least three or four.

"Q. And in any of those burglary convictions, did you receive penitentiary sentences?

"A. Yes, I did.

"Q. Do you remember the length of the penitentiary sentence?

"A. 20 years.

"Q. And in each of those burglary convictions, were you paroled on those sentences?

"A. One time.

"Q. And how long did you serve prior to parole on your 20-year sentence?"

At that point, defendant's trial counsel objected on the ground that evidence of Langley's prior early releases from prison was not relevant. The trial court overruled the objection. Langley then responded that he had served "[a]round 35 or 42 months" on his 20-year sentence. Langley also admitted that he had served only 10 years on a 20-year sentence for robbery.

■ We agree with defendant that evidence of Langley's early releases from prison was not relevant. The evidence tended to demonstrate only that convicted persons do not serve their full sentences because they may be released on parole. That fact had no relevance to any issue before the jury in deciding whether defendant should be sentenced to death. Consequently, the trial court erred when it overruled defendant's objection to that testimony.

■ The state argues that any error in admitting Langley's testimony was harmless. In the circumstances of this case, we agree. Before Langley testified, defense counsel called inmate Thompson as a character witness. On direct examination, Thompson testified that he had been convicted of first-degree manslaughter in 1986 and that he was scheduled to be released in 1993. On cross-examination, Thompson testified, without objection, that he had received a 20-year sentence for his manslaughter conviction. The state also elicited from defendant's other character witnesses, without objection, the lengths of their sentences and their scheduled release dates.

■ Under Oregon law, an error is harmless if there is little, if any, likelihood that the error affected the jury's verdict. *See State v. Isom*, 306 Or 587, 595-96, 761 P2d 524 (1988) (explaining standard). Because the state elicited testimony, without objection, from several other witnesses that was substantially similar to Langley's testimony, any prejudice that defendant may have suffered from Langley's testimony was minor. *See State v. Pinnell*, 311 Or 98, 109, 806 P2d 110 (1991) (erroneous admission of evidence deemed harmless, in part, because the jury already had heard substantially similar evidence). We also conclude, beyond a reasonable doubt,

that the erroneous failure to sustain defendant's objection to the testimony did not contribute to the jury's verdict. *See Chapman v. California*, 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705 (1967) (stating that, under federal law, error is harmless if the appellate court concludes beyond a reasonable doubt that the error did not contribute to the jury's decision to convict).

Defendant also contends that the trial court erred by allowing the state to elicit from two of defendant's character witnesses the circumstances of their escapes and attempted escapes from prison. Defendant argues that evidence of those escapes and attempted escapes was irrelevant and unduly prejudicial, because it encouraged the jury to speculate that defendant might escape if sentenced to prison for life.

■ Defendant never objected to the testimony concerning the witnesses' escapes and attempted escapes on the grounds of relevance or undue prejudice. Thus, defendant's claim of error is unpreserved. *See State v. Isom*, 313 Or 391, 406, 837 P2d 491 (1992) (an objection on one ground is not sufficient to preserve some other objection). We decline to consider defendant's unpreserved claim of error.

### V. STATE'S CLOSING ARGUMENT

■ Defendant contends that the trial court erred in failing to grant a mistrial *sua sponte* because of the following comments made by the prosecutor during closing argument:

> "Three weeks after arriving in Oregon in the summer of 1986, [defendant] and a buddy * * * rob a guy * * *. And the defendant later is convicted of robbery, and he's sentenced to five years in the Oregon State Penitentiary.
>
> "November of 1986, five years in the state penitentiary. He didn't do five years. March 31st, 1987, he's out on temporary leave. As I calculate it, it was 21 weeks after his five-year sentence was imposed. He's not even paroled. He's out on temporary leave. He hasn't even made parole yet. 82 days after being released from prison he and Tim Aikens rape, torture, and murder Candy Straub."

Defendant argues that the prosecutor's comments effectively deprived him of the right to a fair trial by improperly encouraging the jury to vote for the death sentence to

avoid the possibility of his early release from a sentence of life imprisonment. Defendant relies on *State v. White,* 303 Or 333, 342, 736 P2d 552 (1987), in which this court concluded that a prosecutor's remarks about the defendant's failure to testify required a mistrial.

Defendant acknowledges that he took no action during trial to preserve this assignment of error. Defendant nevertheless requests that we exercise our discretion to consider his claim as an error of law apparent on the face of the record. ORAP 5.45(2).

Error is "apparent on the face of the record" only when "the legal point is obvious, not reasonably in dispute." *State v. Brown,* 310 Or 347, 355, 800 P2d 259 (1990). Applying that standard, the trial court's failure to grant a mistrial *sua sponte* constitutes reversible error only if it is beyond dispute that the prosecutor's comments were so prejudicial as to have denied defendant a fair trial. *See Smith,* 310 Or at 24 ("Even if we find the prosecutor's remarks to be improper, tasteless, or inappropriate, we will not find an abuse of discretion in the trial court's denial of the motion for a mistrial unless the effect of the prosecutor's remarks is to deny a defendant a fair trial."). We conclude that the prosecutor's comments were not so prejudicial that the trial court's failure to grant a mistrial *sua sponte,* on the basis of those comments, amounts to an "error of law apparent on the face of the record." Consequently, we reject defendant's argument.

## VI. INSTRUCTION REGARDING LIFE IMPRISONMENT

Defendant argues that the trial court erred by giving the following instruction concerning the statutes that govern a sentence of life imprisonment:

"Now, I want to define life imprisonment for you. If sentenced to life imprisonment, the court shall order that the defendant shall be confined for a minimum of 30 years without the possibility of parole, release on work release, or any form of temporary leave, or employment at a forest or work camp.

"At any time after 20 years from the imposition of that minimum sentence, upon the request of the prisoner, the State Board of Parole shall hold a hearing to determine if

the prisoner is likely to be rehabilitated within a reasonable period of time. The prisoner shall have the burden of proving the likelihood of rehabilitation within a reasonable period of time.

"If upon hearing all the evidence, the board finds unanimously that the prisoner is capable of rehabilitation, the terms of the prisoner's confinement shall be changed to life imprisonment with the possibility of parole or work release. Further requests by the prisoner for a change may be filed at intervals of not less than two years."

The trial court's instruction in this case is similar to that given by the trial court in *Douglas*. *See* 310 Or at 448-49 (setting forth instruction). Defendant argues that the giving of that instruction constitutes reversible error under *Douglas*.

The state makes two arguments in support of its position that the instruction was properly given in this case. First, the state argues that this court's decision in *Douglas* conflicts with the more recent decision of the United States Supreme Court in *Simmons v. South Carolina*, 512 US 154, 114 S Ct 2187, 129 L Ed 2d 133 (1994) (plurality opinion). The state urges us to overrule *Douglas* and to hold that, in *all* capital sentencing proceedings, trial courts may instruct the jury on the possible release of persons sentenced to life in prison.

We are unpersuaded that the Supreme Court's decision in *Simmons* requires us to overrule *Douglas*. In *Simmons*, the trial court refused to instruct the jury, as requested by the defendant, that, under South Carolina law, the defendant would be *ineligible* for parole if sentenced to life imprisonment. The Supreme Court concluded that the trial court's refusal to give that instruction violated the defendant's due process rights under the federal constitution. *Simmons*, 512 US at 171 [, 114 S Ct at 2193]. The Court explained that, without that instruction, the jury mistakenly may have believed that the defendant could be released on parole if he were not sentenced to death. The Court determined that the jury may have sentenced the defendant to death based on that misunderstanding of South Carolina law. *Ibid.*

*Simmons* did not hold that, if a defendant is *eligible* for parole on a life sentence, the jury must be informed of that

fact. Rather, the *Simmons* Court expressly permitted states to determine whether it is proper, in a capital sentencing proceeding, to inform the jury about a defendant's parole eligibility:

"In a State in which parole is available, how the jury's knowledge of parole availability will affect the decision whether or not to impose the death penalty is speculative, and we shall not lightly second-guess a decision whether or not to inform a jury of information regarding parole. *States reasonably may conclude that truthful information regarding the availability of commutation, pardon, and the like, should be kept from the jury in order to provide 'greater protection in [the States'] criminal justice system than the Federal Constitution requires.*" 512 US at 168[, 114 S Ct at 2196], *quoting California v. Ramos*, 463 US 992, 1014, 103 S Ct 3446, 77 L Ed 2d 1171 (1983) (brackets in original; emphasis added).

Justice O'Connor echoed that point in her concurring opinion, which Justices Rehnquist and Kennedy joined:

"We have previously noted with approval, however, that '[m]any state courts have held it improper for the jury to consider or to be informed—through argument or instruction—of the possibility of commutation, pardon, or parole.' *California v Ramos, supra*, at 1013, n 30, 77 L Ed 2d 1171, 103 S Ct 3446. *The decision whether or not to inform the jury of the possibility of early release is generally left to the States*. See *id.*, at 1014, 77 L Ed 2d 1171, 103 S Ct 3446. In a State in which parole is available, the Constitution does not require (or preclude) jury consideration of that fact." 512 US 176[, 114 S Ct at 2200] (O'Connor, J., concurring) (emphasis added).

*Simmons*, therefore, does not require reversal of our decision in *Douglas*.

Second, the state argues that the instruction was proper because the evidence presented in this case permitted the jury, in assessing defendant's future dangerousness, to draw a distinction between the threat that defendant might pose to prison society and to "outside" society in the way that *Douglas* described. The state relies on evidence that defendant engaged in more frequent and more serious acts of criminal violence before his incarceration in 1988 than he did

while he was in prison. The state also relies on evidence that defendant frequently made use of deadly weapons when committing violent crimes outside prison. The state argues that, based on that evidence, a jury reasonably could conclude that defendant would pose less of a threat to prison society than to society at large, because he has only limited access to weapons in prison. Moreover, the state relies on the testimony of defense expert witness, Dr. Leonore Walker, concerning her diagnosis of defendant's psychological disorders. Defendant's trial counsel posed the following question to Walker:

> "Doctor, given [defendant's] background with respect to criminal activity or allegations of criminal activity, and comparing that with what you know about his activity while in the penitentiary, is there any comparison that can be made?"

Walker responded:

> "Well, [defendant] in the penitentiary as well as when he was growing up when he's under structure, and he does not necessarily engage in unlawful activity or violent activity unless he perceived himself as being threatened. The incidents that I'm aware of in the penitentiary were when he believed he was under threat, and that will be common in somebody who's been abused to try and defend themselves under those kinds of conditions. Might be common for almost anybody if they thought that they were under threat. So when he has structure, he follows those rules, and that's been his history throughout his life."

We agree with the state's argument that the foregoing evidence offered by defendant in this case was sufficient to permit the jury to distinguish between the threat that defendant would pose to prison society as compared to the threat (if any) that he would pose to society at large. However, a true weighing of that evidence would require that a juror know whether defendant was likely to *remain* in prison. Thus, in instructing the jury on the possible release of persons sentenced to life in prison, the trial court did not violate the standard set forth in *Douglas* for the giving of that instruction.

In the case at bar, the trial court determined that the instruction was relevant to the "fourth question." In *Douglas*,

this court held that the instruction is relevant to the second question, concerning future dangerousness. 310 Or at 449. In addition, this court said that "[t]he instruction is not relevant to the jury's deliberations on the other three questions." *Id.* at 449 n 9. We have no occasion in this case to revisit that holding because, as discussed above, the instruction is relevant to the second question relating to defendant's future dangerousness. The court did not commit reversible error because, on this record, the instruction was relevant to the second question. *See Rader v. Gibbons and Reed Company*, 261 Or 354, 365 n 3, 494 P2d 412 (1972) (when a trial judge's ruling is correct, it will be upheld on appeal even if the judge's reasons for the ruling are erroneous).

## VII. JURY INSTRUCTION REGARDING DELIBERATENESS

Defendant contends that the trial court erred in instructing the jury on the definition of deliberateness. In the penalty-phase proceeding, the first question that the jury must answer is "[w]hether the conduct of the defendant that caused the death of the deceased was committed deliberately." ORS 163.150(1)(b)(A). In the guilt-phase proceeding for aggravated murder, the state must prove that defendant committed the murder "intentionally." ORS 163.095, 163.115-(1)(a). Defendant claims that there is a legal distinction between the elements of "deliberately" and "intentionally" in this context because ORS 163.150(1)(b)(A), which governs the penalty-phase proceeding, requires the showing of a different and greater culpable mental state than that of "intentionally." *Wagner I*, 305 Or at 147. Defendant argues that the trial court should have explained that difference to the jury and argues that the trial court's failure to do so "lessened the standard of proof for an affirmative finding on the first question." Finally, the defendant argues that the trial court's failure to draw the distinction created a substantial likelihood that the jury relied on the aggravated murder conviction to conclude that the defendant acted deliberately.

The trial court reasoned that drawing a distinction between the requisite mental states was unnecessary, because the jury for the second penalty-phase proceeding was not the same jury that served for the guilt phase of defendant's trial. The trial court stated that instructing the jury

that "deliberately" means something different from "intentionally" would not have assisted the jury in its determination of the first question. Instead, according to the trial court, such an instruction may have confused the jury because the trial court had not instructed the jury on the meaning of the term "intentionally" in the first place. The trial court also instructed the jury that defendant's prior conviction of aggravated murder did not answer the question whether he acted "deliberately."

■ We conclude that the trial court's instruction was proper. The court instructed the jury on the meaning of deliberateness. The court's additional instruction—that the jury should not rely on defendant's prior conviction to determine the deliberateness issue—satisfies all defendant's other arguments supporting this assignment of error. That additional instruction served the same purpose that defendant's requested instruction would have served, because it ensured that the jury would not return a "yes" answer on the first question simply because defendant previously had been found guilty of aggravated murder. It is not error for a trial court to refuse to give a requested instruction if the instruction given by the court adequately addresses the subject of the requested instruction. *State v. Tucker*, 315 Or 321, 332, 845 P2d 904 (1993). We conclude that, in this case, the trial court did not err in refusing to give defendant's requested instruction.

## VIII. SENTENCE ON REMAND

■ Defendant contends that the imposition of the death sentence on remand was improper because the trial court, at his guilt- and first penalty-phase proceeding, ordered that, if the original death sentence was set aside on appeal, a life sentence should be imposed automatically on remand. The state argues that the defendant failed to preserve this assignment below. We agree. Defendant has not demonstrated that the second trial court's imposition of the death sentence constituted an error of law "apparent on the face of the record." ORAP 5.45(2). We decline to consider defendant's unpreserved claim of error. We turn to defendant's constitutional claims.

## IX. *EX POST FACTO* and DUE PROCESS CLAIMS

Defendant argues that, in three respects, the trial court retroactively applied several post-crime amendments to Oregon's capital sentencing scheme to his penalty-phase proceeding in violation of the state and federal *ex post facto* clauses and the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution.[9] For the reasons that follow, we conclude that defendant's *ex post facto* arguments are not well taken.

■　　We first address defendant's state constitutional argument before addressing his federal constitutional argument. *See State v. Charboneau*, 323 Or 38, 53, 913 P2d 308 (1996) (stating principle). First, defendant argues that the trial court, in the second penalty-phase proceeding, retroactively applied 1989 and 1991 amendments to ORS 163.150 that created a "fourth question" for jury consideration in capital cases. Or Laws 1989, ch 790, § 135b; Or Laws 1991, ch 885, § 2. *Montez I* and *Wagner II* dispose of that argument. In *Montez I*, this court remanded defendant's case for a new penalty-phase proceeding because, as this court explained in *Wagner II*, defendant was entitled to an instruction requiring the jury to consider mitigating circumstances that might justify imposition of a life sentence. *Montez I*, 309 Or at 610; *Wagner II*, 309 Or at 15-16. Under the rationale of *Wagner II*, the trial court had the authority and the responsibility to instruct the jury to consider mitigating circumstances in the penalty phase. In carrying out that responsibility, the trial court, in accordance with *Wagner II*, applied Oregon law in

---

[9] Article I, section 21, of the Oregon Constitution, provides in part:

"No *ex-post facto* law * * * shall ever be passed * * *."

Article I, section 10, of the United States Constitution, provides in part:

"No State shall * * * pass any * * * *ex post facto* Law * * *."

The Fifth Amendment to the United States Constitution provides in part:

"No person shall be * * * deprived of life, liberty, or property, without due process of law * * *."

The Fourteenth Amendment to the United States Constitution provides in part:

"No State shall * * * deprive any person of life, liberty, or property, without due process of law * * *."

effect on the date of defendant's crime, not the 1989 amendment to ORS 163.150. *See Wagner II*, 309 Or at 20 (remanding for resentencing, including administration of a mitigating circumstances instruction, for capital crime committed in 1985). Accordingly, the trial court's instruction did not violate the *ex post facto* clauses.

Second, defendant argues that the trial court violated the *ex post facto* clauses by applying the 1989 statutory amendments that allowed resentencing before a new jury and authorized admission in the second penalty-phase proceeding of all evidence that was properly admitted in prior guilt-phase and penalty-phase proceedings. Or Laws 1989, ch 790, § 135b. In *Wagner II*, this court held that a defendant convicted of a capital crime, whose sentence is reversed on appeal, may be resentenced before a new jury. *Wagner II*, 309 Or at 18. In addition, under existing case law, a post-offense statutory change allowing the admission of previously inadmissible evidence is not an *ex post facto* law, because it does not punish any act that was legal at the time it occurred, change the punishment for those acts, or deprive the defendant of a defense for those acts. *See State v. Gallant*, 307 Or 152, 155, 764 P2d 920 (1988) (post-offense change in evidence code, which rendered admissible certain impeachment evidence, was not an *ex post facto* law). Consequently, the trial court did not apply an *ex post facto* law by sentencing defendant before a new jury and by admitting evidence that was properly excluded in earlier proceedings.

Third, defendant contends that the trial court violated the *ex post facto* clauses by applying, in the second penalty-phase proceeding, a number of other post-offense statutory amendments to ORS 163.105 and 163.150.[10] We have examined the record and conclude that the trial court did not

---

[10] Defendant relies on the following amendments to ORS 163.105: Or Laws 1987, ch 158 § 23 (corrects reference to Board of Parole); Or Laws 1989, ch 720, § 1 (adds sentencing option of life without parole); and Or Laws 1991, ch 126, § 8 (restates unanimous-vote requirement for agency decision to grant parole or release). Defendant also relies on the following amendments to ORS 163.150: Or Laws 1987, ch 557, § 1 (sentencing procedure following guilty plea); Or Laws 1989, ch 720, § 1 (life without parole option); Or Laws 1991, ch 725, § 2 (alternate juror substitution procedure); and Or Laws 1991, ch 885, § 2 (adds post-*Wagner II* "fourth question" and mitigating evidence jury instruction; provides for automatic stay of appellate judgment to permit petition for writ of *certiorari*).

apply, in the second penalty-phase proceeding, the statutory amendments on which defendant relies. From the foregoing, it follows that the trial court did not violate state or federal constitutional provisions that prohibit *ex post facto* laws.

Finally, defendant argues that, if his *ex post facto* claims fail, the trial court's application of the resentencing amendments violates due process. He relies on *Coleman v. McCormick*, 874 F2d 1280 (9th Cir 1989), in which the United States Court of Appeals for the Ninth Circuit held that Montana's application of certain new statutory procedures in a capital resentencing proceeding deprived the defendant of due process, because he did not receive adequate notice of the consequences that his trial level decisions would have at the sentencing hearing. Defendant's due process argument fails because his premise is incorrect. Under the rationale of *Wagner II*, the trial court did not apply any post-offense statutory amendments to Oregon's capital sentencing scheme. Accordingly, we reject defendant's due process argument.

## X. REMAINING ASSIGNMENTS OF ERROR

Defendant makes several additional assignments of error. We have considered all of them and every argument made in support thereof. Any assignment of error or argument not discussed in this opinion either has been discussed by this court in previous cases and resolved against defendant or is not well taken. Further discussion of the issues would not benefit the bench or bar. We hold that no error occurred as claimed in any of the remaining assignments of error.

The sentence of death is affirmed.

**FADELEY, J.,** dissenting.

I agree with Justice Durham's footnote 5 in the majority opinion and especially the portion that states *"Penry* [*v. Lynaugh,* 492 US 302, 109 S Ct 2934, 106 L Ed 2d 256 (1989),] dictates the conclusion * * * that, in 1987, Oregon had enacted no *valid* statute authorizing a death sentence." 324 Or at 346 n 5 (emphasis in original).[1]

---

[1] *See also State v. Moen,* 309 Or 45, 98, 786 P2d 111 (1990) (Fadeley, J., dissenting) (detailing the 100 words that the majority of this court, not the legislature,

A death sentence was not possible under the law in place at the time of the murder in this case. On June 20, 1987, there was no valid statute permitting or authorizing a sentence of death. In 1990, this court, in *State v. Wagner,* 309 Or 5, 786 P2d 93, *cert den* 498 US 879 (1990) (*Wagner II*), changed the statutory law. Later, the legislature did likewise. Both changes came after the crime was committed. Both changes were made to permit a punishment of death that was not permissible without those changes.

The death penalty decisions of this court make the change—to permit the punishment of death to be added to the penalties legally available for the crime—eminently clear. In *State v. Wagner,* 305 Or 115, 752 P2d 1136 (1988) (*Wagner I*), this court held that no fourth question whether a defendant should be sentenced to death was provided by the Oregon statute, *id.* at 144-45, and then held that none was needed, *id.* at 156, 160. That holding was entered *after* Montez had committed the present crime. It was not until *Wagner II* was decided in 1990 that the fourth question was added to the statute by the court.

The majority opinion states:

> "Under the rationale of *Wagner II*, the trial court did not apply any post-offense statutory amendments to Oregon's capital sentencing scheme." 324 Or at 365.

and

> "[T]he trial court, in accordance with *Wagner II*, applied Oregon law in effect on the date of defendant's crime, not the 1989 amendment to ORS 163.150." *Id.* at 364.

Those statements are not correct. The law in effect on the date of the crime did not contain what was added to it later. That post-crime addition forms the primary basis for this dissent.

---

added in 1990 to the version of the statute that was in effect in 1987, when this crime was committed, in an effort to make the statute, with the 1990 additions by this court, constitutional under the requirements of *Penry*).

This dissent rests on the premise of law that only the legislative branch may enact penal laws; the power of punishment is legislative. *State v. Isom*, 313 Or 391, 395, 837 P2d 491 (1992).[2] Yet, here the court legislated in 1990 in *Wagner II* to enact a penal law, an act that this court says is beyond the power of this court.

There are additional reasons why the more recent penalty-phase trial result should not stand. The *ex post facto* effect of increasing the permissible punishment for the crime after the crime was committed is obvious. Of course, using the 1989 or 1991 amendments to govern the penalty for this 1987 crime also would have increased the permitted penalty after the crime was committed. That change in permissible punishment was no mere change in "evidence" rules.

In addition, the penalty-phase trial was not conducted fairly. I think there is more than a little likelihood that the nearly constant references to parole of hardened criminals, and to their misdeeds while at large on parole or on temporary passes, affected the jury's verdict. Certainly, I have a reasonable doubt about that. Continued references to early parole by state witnesses on direct and on cross-examination of defense witnesses, in instructions about early parole given by the judge, and during closing arguments addressed to the jury by the prosecutor permeated this trial.[3] When objection was made to testimony on this subject, the court overruled it, a ruling that the majority agrees was erroneous. I see that error, in the context of this trial, as harmful.[4]

---

[2] My opinion in *State v. Pinnell*, 319 Or 438, 447, 877 P2d 635 (1994) (Fadeley, J., dissenting), discusses this and the court's unlawful death legislating, in more detail.

[3] It is no surprise that the witnesses available to defendant, who had been incarcerated since 1987, on the issue of present character and dangerousness are people who have known him only in prison.

[4] I find that the repeated references to parole and misdeeds of various persons on parole throughout the trial go beyond harmless error. I do not agree with the view that trial counsel's failure to object to many of those references makes the erroneous ruling when he did object any less harmful. No claim of invited error is present.

In death penalty cases, the statutes provide for a mandatory appeal directly to this court. The purpose of mandatory appeal is to assure society that the sentence

The result of the trial is not made any more trust-
worthy by trial defense counsel's failure to object at other
points. Nor is the issue simply whether other objections were
made; the questions posed by harmless error analysis are, at
the state level, whether prejudice is unlikely or, at the federal
level, whether, beyond a reasonable doubt, the error had no
effect. Because I believe that the error may have affected the
penalty outcome, I cannot join in affirming the penalty.

As I stated *in 1990,* when this criminal case was pre-
viously before this court,

> "the court should assess and fix final punishment now
> under the statute rather than sending this case back to the
> trial court for a further penalty phase trial which will lead
> to further delay and may lead to further appeals costly to
> the public." *State v. Montez,* 309 Or 564, 618, 789 P2d 1352
> (1990) (*Montez I*) (Fadeley, J., dissenting).

In my view, that was then, and remains now, the appropriate
lawful disposition of this case.

---

of death is free from error. Inadequate assistance of trial counsel should be consid-
ered on direct appeal in death penalty cases. Relegating consideration of that con-
stitutional violation to a collateral attack creates a multiplicity of proceedings
involving additional courts and costs.

Nor is it certain to be an adequate remedy. In *Bryant v. Thompson,* 324 Or 141,
922 P2d 1219 (1996), the condemned wished to die, abjured any defense to the
death warrant proceeding and, therefore, brought no case contesting it or seeking
post-conviction relief because of the inadequate assistance of his penalty-phase
counsel, even though a colorable claim to that effect was present. The condemned,
Wright, was executed notwithstanding the colorable claim that his constitutinal
right to counsel had been violated, because neither the condemned nor anyone with
authority to represent him had made any post-conviction challenge.