Argued and submitted October 6, 1999, affirmed May 10, 2000

Rustin A. BREWER,
as Personal Representative for the Estate of
Caitlin Jean O'Connor, Deceased,
*Appellant,*

*v.*

DEPARTMENT OF FISH AND WILDLIFE;
Fish and Wildlife Commission;
Department of Transportation;
Oregon Transportation Commission;
Swackhammer Ditch Improvement District
and State Parks & Recreation Department,
*Respondents.*

(97-10-38339; CA A103245 (Control))

Michael O'CONNOR,
as Personal Representative for the Estate of
Pamela Anne O'Connor, Deceased,
*Appellant,*

*v.*

DEPARTMENT OF FISH AND WILDLIFE;
Fish and Wildlife Commission;
Department of Transportation;
Oregon Transportation Commission;
Swackhammer Ditch Improvement District
and State Parks & Recreation Department,
*Respondents.*

(97-10-38340; CA A103246)

2 P3d 418

W. Eugene Hallman argued the cause and filed the briefs for appellants.

Jas. Jeffrey Adams, Assistant Attorney General, argued the cause for respondents Department of Fish and Wildlife, Fish and Wildlife Commission, Department of Transportation, Oregon Transportation Commission, and State Parks & Recreation Department. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

G. Kenneth Shiroishi argued the cause for respondent Swackhammer Ditch Improvement District. With him on the brief were Dunn Carney Allen Higgins & Tongue.

Before Landau, Presiding Judge, and De Muniz and Linder, Judges.

DE MUNIZ, J.

Landau, P. J., concurring.

**DE MUNIZ, J.**

Plaintiffs appeal from the trial court's dismissal of their claims for the wrongful deaths of Pamela Anne O'Connor and her daughter Caitlin Jean O'Connor. Plaintiffs are the personal representatives of the O'Connors' estates. The O'Connors died while swimming in an area of Catherine Creek below a fish migration dam owned or maintained by the various defendants. Plaintiffs filed suit against numerous state agencies (state defendants) and the Swackhammer Ditch Improvement District (Swackhammer), alleging that defendants were negligent because the dam was built in such a manner that it created a dangerous undertow in which the O'Connors were caught. Defendants moved to dismiss plaintiffs' claims under ORCP 21 A(8) on the ground that plaintiffs failed to state a claim, because defendants were immune from liability under the Public Use of Lands Act (Act), ORS 105.672 *et seq.* The trial court rejected plaintiffs' argument that the Act was unconstitutional under Article I, section 10, of the Oregon Constitution, and it granted defendant's motion. Plaintiffs appeal, and, for the following reasons, we affirm.

■ We review for errors of law a trial court's grant of a motion to dismiss for failure to state a claim under ORCP 21 A(8), accepting as true all well-pleaded factual allegations and giving plaintiffs the benefit of all favorable inferences that may be drawn from the facts alleged. *Yanney v. Kohler*, 147 Or App 269, 272, 935 P2d 1235, *rev den* 325 Or 368 (1997). On June 30, 1996, Pamela O'Connor, her son, and her nine-year-old daughter Caitlin went with a neighbor child to an area of Catherine Creek below a fish migration dam that traditionally has been used by the public for recreational purposes, including swimming. One of the children fell into the creek, and Pamela attempted to rescue the child but was caught in an undertow created by the dam. Caitlin then attempted to rescue her mother. Both Pamela and Caitlin suffered injuries resulting in their deaths. Plaintiffs alleged in their complaint that the O'Connors' deaths were the result of negligence by defendants in building and using a dam that unnecessarily created an unreasonably dangerous undertow.

Defendants moved to dismiss plaintiffs' claims on the ground that they failed to state a claim against defendants as a matter of law because defendants were immune from liability under the Act. Plaintiffs responded that the Act serves to deprive them of all remedies and therefore violates Article I, section 10, of the Oregon Constitution. The trial court held that the Act defeated plaintiffs' claim and did not violate Article I, section 10. Plaintiffs appeal, arguing that the trial court erred because the Act does not bar their actions against all defendants and because, in any event, the Act violates Article I, section 10.

We turn first to plaintiffs' statutory argument that the Act does not bar their actions against all defendants. Plaintiffs alleged that the property on which the accidents occurred is owned by the Oregon Transportation Commission or the Oregon State Parks and Recreation Department and that the Oregon Fish and Wildlife Commission is the owner of the dam and is responsible for its maintenance and operation. Plaintiffs also alleged that the Oregon Department of Transportation or Oregon State Parks and Recreation Department maintains and controls the land for the Oregon Transportation Commission and that the Oregon Department of Fish and Wildlife (ODFW) constructed the dam and is responsible for its maintenance and operation. Plaintiffs further alleged that Swackhammer is in charge of maintenance and operation of the dam. Plaintiffs argue on appeal that only one entity owns the land on which the accident occurred and that the others therefore cannot be deemed to fall within the immunity provided by the Act. Plaintiffs argue that, based on its allegations, neither ODFW nor Swackhammer is an "owner" and thus does not qualify for immunity under the Act.

ORS 105.682(1) provides:

"Except as provided by subsection (2) of this section [pertaining to intentional injuries], and subject to the provisions of ORS 105.688 [limiting immunity to those who do not charge for use of the land or who charge no more than $20 per cord for woodcutting on the land], an owner of land is not liable in contract or tort for any personal injury, death or property damage that arises out of the use of the land for recreational purposes, woodcutting or the harvest of special

forest products when the owner of land either directly or indirectly permits any person to use the land for recreational purposes, woodcutting or the harvest of special forest products. The limitation on liability provided by this section applies if the principal purpose for entry upon the land is for recreational purposes, woodcutting or the harvest of special forest products, and is not affected if the injury, death or damage occurs while the person entering land is engaging in activities other than the use of the land for recreational purposes, woodcutting or the harvest of special forest products."

"Owner" is defined by ORS 105.672(4) as "the possessor of any interest in any land, including but not limited to possession of a fee title. 'Owner' includes a tenant, lessee, occupant or other person in possession of the land." "Land" is defined by ORS 105.672(3) as including "all real property, whether publicly or privately owned." ORS 105.688(1)(b) and (c) make ORS 105.682(1) applicable to all "bodies of water, watercourses, * * * fixtures and structures" and all "machinery or equipment" on the land in question.

■　　Although "real property" as used in the "land" definition found in ORS 105.672(3) is not defined by statute, its common meaning would include fixtures such as dams. Real property is defined as: "Land and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land." *Black's Law Dictionary,* 1234 (7th ed 1999). That definition comports with the declaration in ORS 105.688 indicating that the immunities provided by ORS 105.682 extend to fixtures such as a dam. We conclude that the Act applies to the dam and the waters below it.

■　　The question, then, is whether ODFW and Swackhammer fall within the definition of "owner." ORS 105.672(4). Plaintiffs alleged in their complaint that ODFW and Swackhammer both maintain and operate the dam. In order for plaintiffs to prevail on this point, we would have to conclude that one who maintains and operates a fixture on land is not an "occupant, or other person in possession of the land" under the definition provided in ORS 105.672(4). Although we have not construed the current version of the definition of "owner" in ORS 105.672(4), our interpretation of

a very similar definition in an earlier version of the Act is informative. In *Denton v. L. W. Vail Co.*, 23 Or App 28, 30-31, 541 P2d 511 (1975), the plaintiff was injured while riding a motorcycle on a closed stretch of road that was owned by the federal government but was under construction by the Oregon Department of Transportation and its contractors. Under an earlier definition of "owner" found in the Act, we concluded that "the contractors and the Department of Transportation were persons in possession of the land."[1] *Id.* at 37. Although the scope of the Act has changed since *Denton* was decided, the key language of the definition of "owner" has not. In *Denton*, we found that those who were constructing improvements on land were "owners" within the meaning of the definition found in the Act. If those who merely construct improvements on land qualify as owners, certainly those who maintain and operate improvements on land also fall within the scope of that definition. The trial court correctly concluded that ODFW and Swackhammer come within the ambit of the Act for purposes of immunity.

We turn to plaintiffs' constitutional arguments. Article I, section 10, of the Oregon Constitution, provides, in part, that "every man shall have remedy by due course of law for injury done him in his person, property, or reputation." Plaintiffs argue that the Act deprives them of a remedy by due course of law for the injuries to Pamela and Caitlin O'Connor that otherwise would be cognizable under Oregon law. Plaintiffs contend that the legislature has recognized a right to recover for injuries such as those sustained by the O'Connors via the wrongful death statute, ORS 30.020. They further contend that the legislature, although recognizing such a right, has denied them a remedy for the injuries, eliminating their remedies for those injuries by providing immunity for defendants who qualify as owners of recreational lands under the Act. Defendants respond that the legislature has not recognized a right but abolished a remedy; rather, it has declined to recognize the existence of a right and exercised its "authority to determine what constitutes a legally cognizable injury." *Sealey v. Hicks*, 309 Or 387, 394, 788 P2d 435 (1990).

---

[1] The definition of "owner," found at that time in ORS 105.655(3), indicated that " 'owner' means the possessor of a fee title interest in any land, a tenant, lessee, occupant or other person in possession of the land."

In defendants' view, the legislature, in enacting the Act, has determined that an injured recreational land user does not have a *right* to recover from a landowner for negligent injuries if the landowner has opened the land for recreational purposes in accordance with the Act.

The state defendants also make another argument. They argue that, given the nature of the state's sovereign immunity, plaintiffs never had a right to recover against the state that was guaranteed by Article I, section 10. In *Hale v. Port of Portland*, 308 Or 508, 513-16, 783 P2d 506 (1989), the court noted that the common-law rule of sovereign immunity—that the sovereign could not be sued in its own courts—was universally adopted in the various states, including Oregon. Article IV, section 24, of the Oregon Constitution, permits the legislature to waive its immunity by way of general legislation but not by way of special legislation, such as authorizing a particular action by a particular plaintiff. 308 Or at 517. The Oregon Tort Claims Act is general legislation partially waiving the state's sovereign immunity. *Id.* In *Hale*, the court held that the plaintiff was not denied a "remedy in due course of law" in violation of Article I, section 10, against the Port of Portland, a part of the state's government, because the Port was immune to the same extent that the state was immune. Therefore, the court concluded, the plaintiff never had a right to recover against the Port by virtue of the guarantee provided by Article I, section 10, of the Oregon Constitution. *See also Gearin v. Marion County*, 110 Or 390, 396, 223 P 929 (1924) (Article I, section 10, has "no application to an action sounding in tort when brought against the state"). In the view of the state defendants, under the rationale set forth in *Hale* and *Gearin*, plaintiffs have no right to recover against the state defendants for the deaths of the O'Connors that is guaranteed by Article I, section 10.

Plaintiffs respond that the argument is unpreserved, that it is not an "error of law apparent on the face of the record," ORAP 5.45(2), and that this court should not exercise its discretion to consider the error. *See generally Ailes v. Portland Meadows, Inc.*, 312 Or 376, 823 P2d 956 (1991). Plaintiffs are confusing two related, yet analytically distinct, concepts: unpreserved arguments in support of reversal of a ruling and alternative ground for affirmance of a

ruling. The state defendants are not attempting to make a claim of *error* for the first time on appeal. ORAP 5.45 relates only to assignments of error in the briefs of appellants or cross-appellants. It places no limitations on arguments advanced by respondents on appeal. Neither ORAP 5.55 nor ORAP 5.57, relating to the contents of respondents' briefs, requires respondents who are arguing in favor of sustaining rather than reversing a ruling of the trial court to have preserved their legal arguments in the trial court. Contrary to plaintiffs' assertions, this court has regularly considered alternative ground for upholding the rulings of trial courts. However, this court has placed a limitation on the general proposition that we may affirm a trial court's ruling on alternative grounds: We may generally "affirm a ruling of the trial court on grounds different from those on which the court relied 'provided that there [was] evidence in the record to support the alternative ground,'" but not "'if the parties were not allowed to develop the factual record at trial to address the issue raised for the first time on appeal.'" *State v. Jacobsen*, 142 Or App 341, 345, 922 P2d 677 (1996), *quoting State v. Knox*, 134 Or App 154, 160-61, 894 P2d 1185 (1995), *vacated and remanded on other grounds* 327 Or 97 (1998). Here, plaintiffs do not argue that any factual record is necessary in order to apply the general principles of sovereign immunity to the state defendants. It is not in dispute that the state agency defendants are, in fact, state agency defendants.[2] Because the state's alternative ground for affirmance presents a purely legal question and requires no factual development of a record, we are able to consider it in the first instance on appeal.

On the merits, plaintiffs argue that ORS 105.682 "does not seek to bestow immunity on the state because it is a 'sovereign,'" but rather seeks to bestow immunity on all

---

[2] Swackhammer does not argue on appeal that it, too, is an instrumentality of the state that may partake of the state's sovereign immunity. We express no opinion as to whether or not this defendant *is*, in fact, the type of entity that may share the state's immunity. *See generally Hale*, 308 Or at 518 (noting that various county entities and municipal corporations share the state's immunity). It is not apparent from plaintiffs' pleadings what type of entity Swackhammer is, and no responsive pleading was filed that would clarify this defendant's status. For these reasons, we are not in the position to decide that question in the first instance on appeal.

qualified recreational land owners. Plaintiffs therefore reason that only ORS 30.265, pertaining to tort actions against public bodies, bestows sovereign immunity on the state and that sovereign immunity is necessarily waived unless specifically exempted within ORS 30.265. Thus, in plaintiffs' view, sovereign immunity can play no part in an analysis of the constitutionality of the Act. We reject the premise of plaintiffs' argument as unsound. Sovereign immunity is not something that is bestowed on the state by a legislative act. It is a characteristic that the state, as sovereign, simply possesses. The legislature has the power to *waive* the state's sovereign immunity if it does so in accordance with Article IV, section 24. The legislature must affirmatively act to waive the state's sovereign immunity but it need not enact legislation to "bestow" sovereign immunity on the state.

■ ■ Plaintiffs' argument reduces to the proposition that there is an inconsistency between ORS 30.265, which partially waives the state's sovereign immunity but contains exceptions that do not pertain to recreational land immunity, and ORS 105.682, which provides recreational land immunity to the state, as well as to other qualified landowners. We see no inconsistency that would implicate the remedies clause of Article I, section 10. Although it is possible that a plaintiff might make a purely statutory argument that ORS 30.265 waived any immunity the state otherwise would have had under ORS 105.682, and thus controls over that statute, that is not what plaintiff is arguing here. Rather, plaintiffs are contending that, because ORS 30.265 and ORS 105.682 "bestow" different types (or quantities) of immunity on the state, a remedies clause violation has occurred. However, as applied to state defendants, neither statute bestows any immunity that the state otherwise would not have because no affirmative act of the legislature is necessary to establish the state's sovereign immunity. Thus, plaintiffs cannot demonstrate by reliance on those statutes that the legislature has recognized a right to recover against state defendants but denied them a remedy by "bestowing" immunity on the state defendants via a statutory enactment. We conclude that the trial court correctly dismissed the claims against the state defendants.

■ We now turn to plaintiffs' claims against defendant Swackhammer. The question before us is whether the legislature, in enacting the Act, has permissibly abolished a right of action or impermissibly abolished a remedy while recognizing a right, in violation of Article I, section 10. Given recent case law construing Article I, section 10, the answer to that question is less than clear.

■ ■ We recognize at the outset that the problem presented by this case is not an easy one to resolve because no developed, comprehensive and coherent body of case law interpreting the remedies clause of Article I, section 10, exists. As numerous scholarly commentators and the Oregon Supreme Court itself have noted, the scope of the remedies clause is less than clear from the text of the constitutional provision and the case law interpreting it. *See Neher v. Chartier*, 319 Or 417, 422-23, 879 P2d 156 (1994) (noting variations in the application of this provision); *Hale v. Port of Portland*, 308 Or at 519 (describing Article I, section 10, jurisprudence as "convoluted"); Jonathan Hoffman, *By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions*, 74 Or L Rev 1279 (1995); David Schuman, *The Right to a Remedy*, 65 Temp L Rev 1197 (1992); David Schuman, *Oregon's Remedy Guarantee: Article I, Section 10 of the Oregon Constitution*, 65 Or L Rev 35 (1986); Hans Linde, *Without "Due Process": Unconstitutional Law in Oregon*, 49 Or L Rev 125 (1970). One proposition of "black letter" law has emerged from the relative chaos of the case law interpreting Article I, section 10: The legislature cannot "abolish a remedy and at the same time recognize the existence of a right." *Hale*, 308 Or at 521, *quoting Noonan v. City of Portland,* 162 Or 213, 249-50, 88 P2d 808 (1939).[3] *See also Sealey*, 309 Or at 394 ("The legislature has the authority to determine what constitutes a legally cognizable injury.").

---

[3] Another proposition of "black letter" law that has emerged is that the legislature may alter a cause of action "so long as the party injured is not left entirely without a remedy," and "the remedy is a substantial one." *Hale*, 308 Or at 523. In the present case, however, no question is presented as to whether the plaintiffs have a remedy that is "substantial" enough to satisfy those criteria. Defendants acknowledge that the legislature has not provided plaintiff with any remedy against defendants under the circumstances presented here.

In *Neher*, the court stated:

"[T]his court [has] recognized the legislature's ability to change the law, and in fact to abolish entirely a right of action, whether or not the right involved had existed at common law at the time of the Oregon Constitutional Convention. * * * The legislature's ability to make such alterations to rights of action, however, was not unfettered: it could not abolish a remedy and at the same time recognize the existence of a right." 319 Or at 427-28 (citations and internal quotation marks omitted).

The question before the court in *Neher* was whether a plaintiff in a wrongful death case could recover for the death of a decedent who was struck by a Tri-Met bus in the course of her employment. The decedent was covered by workers' compensation at the time of her death, and, under workers' compensation law, her estate was entitled to a burial fee of up to $3,000. *Id.* at 420-21. ORS 30.265(3) provided, in part, that public bodies and their employees are immune from liability for any claim for injury or death to any person covered by any workers' compensation law. That statute provided immunity for both Tri-Met and the bus driver who struck the plaintiff's decedent. The question before the court was whether ORS 30.265(3) violated Article I, section 10, by denying plaintiff a remedy in due course of law.[4] The court concluded that the $3,000 burial fee did not provide a substantial remedy to compensate the decedent's surviving parents and that they had been left wholly without a remedy. *Neher*, 319 Or at 426-27.[5] The court then turned to the question of whether ORS 30.265(3) violated the remedies clause of Article I, section 10. The court concluded that the wrongful death statute recognized "the existence of a right to recovery for surviving parents for damages to compensate them" for certain types of loss but that ORS 30.265(3)(a) operated "to abolish the parents' remedy under circumstances such as those present in this case[.]" *Neher*, 319 Or at 428. The court thus concluded

---

[1] No question was raised by defendants in *Neher* about sovereign immunity, and the court did not discuss the potential relevance of the sovereign immunity analysis from *Hale.*

[5] The court distinguished between the decedent's *estate,* which was entitled to a remedy, and the decedent's parents, who were entitled to recover for pecuniary loss and loss of society, companionship and services of the decedent under the wrongful death statute. *Neher,* 319 Or at 426.

that ORS 30.265(3)(a) did not permissibly abolish a right but unconstitutionally abolished a remedy for a recognized right. *Id.*

*Neher* is the strongest case supporting plaintiffs' position. It can be analogized fairly closely to this case: If the wrongful death statute recognizes the existence of a right for a personal representative to recover damages to compensate beneficiaries such as surviving parents, then the Act, like ORS 30.265(3)(a), could be said to abolish the beneficiaries' right to a remedy under the particular circumstances present here.

However, several other recent cases from the Oregon Supreme Court indicate that the analysis is not quite so straightforward. Most recently, the court discussed the remedies clause of Article I, section 10, in *Kilminster v. Day Management Corp.*, 323 Or 618, 919 P2d 474 (1996). There, the court again was faced with the question whether a statutory enactment that precluded recovery for wrongful death under certain circumstances ran afoul of Article I, section 10. In *Kilminster*, as in *Neher*, the decedent died in the course and scope of employment. *Id.* at 621. As in *Neher*, the *Kilminster* plaintiffs were the parents and personal representatives of the decedent's estate and alleged that the decedent died as the result of negligence, and, thus, that they were entitled to a remedy under the wrongful death statute. The defendant, however, unlike the *Neher* defendants, were the decedent's employer and the employer's president. *Id.* As in *Neher*, the *Kilminster* defendants asserted that the sole remedy for the decedent's death was through the workers' compensation system. *Id.* at 622.

In *Kilminster*, it was not ORS 30.265(3) that stood in the way of the plaintiffs' recovery under the wrongful death statute, but it was ORS 656.018(1), which provides, in pertinent part, that a complying employer's liability for all injuries to employees arising out of and in the course of employment "is exclusive and in place of all other liability arising out of" such injuries. ORS 656.018(2) further notes that the rights under the workers' compensation laws of subject workers and beneficiaries of such workers for on-the-job injuries

"are in lieu of any remedies they might otherwise have for such injuries * * * under * * * other laws, common law or statute, except to the extent the worker is expressly given the right under this chapter to bring suit against the employer of the worker for an injury[.]"

By analogy, the present case resembles *Kilminster* in the same way it resembles *Neher*: The wrongful death statute recognizes the existence of a right for a personal representative to recover damages to compensate beneficiaries such as surviving parents, yet another statute could be said to abolish the beneficiaries' right to a remedy under the particular circumstances.

In *Kilminster*, however, unlike in *Neher*, the court held that the statute precluding recovery for the decedent's wrongful death did not violate Article I, section 10. *Kilminster*, 323 Or at 627. The court distinguished *Neher* in several ways. First, it noted that the wrongful death statute gave personal representatives of decedents' estates only derivative rights—that is, the statute "gives a party a right to bring a wrongful death action only 'if the decedent might have maintained an action, had the decedent lived[.]' " *Id.* at 626, *quoting* ORS 30.020. The court thus concluded that the plaintiffs had no independent basis from which to derive a right to recover for the decedent's wrongful death. *Id.* The court went on:

"The legislature has chosen not to provide decedent's parents with a negligence-based wrongful death action in this case. Because the legislature has chosen not to provide decedent's parents with a wrongful death action based on a theory of negligence, and because Oregon has no common law action for wrongful death, * * * *they have suffered no legally cognizable injury to their person, property, or reputation.* Therefore, application of ORS 656.018 to this wrongful death action brought under ORS 30.020(1) does not violate Article I, section 10." *Id.* at 627 (emphasis added; citation omitted).[6]

_____

[6] The court implicitly acknowledged that the same reasoning could have applied in *Neher* but that, in that case, "the parties did not raise, and the court did not address, the question whether the statutes at issue there gave the plaintiff a derivative (as distinct from an independent) right." *Id.* at 628.

The court went on to try to distinguish *Neher*. It drew a distinction between the workers' compensation exclusivity provision of ORS 656.018 and the OTCA immunity provision at issue in *Neher*, noting that the OTCA provision granted immunity to the defendants "when those defendants' relationship to the decedent was *unrelated* to the decedent's relationship with her employer." *Kilminster*, 323 Or at 627 (emphasis in original). The court pointed out that, in *Neher*, "the challenged grant of governmental immunity was 'piggy backed' atop ORS 656.018." *Id*. The court saw a significant distinction in the fact that the *Kilminster* plaintiffs' "negligent wrongful death claim against decedent's employer is controlled directly by ORS 656.018[.]" *Id*. at 627-28.

We find the court's reasoning in *Kilminster*, particularly its attempt to distinguish *Neher*, to be somewhat opaque. It appears that the *Kilminster* court implicitly acknowledged that the *Neher* analysis was incorrect in concluding that the wrongful death statute recognized "the existence of a right to recovery for surviving parents for damages to compensate them" for certain pecuniary losses, distinct from a decedent's rights, *Neher*, 319 Or at 428, because, as the court concluded in *Kilminster*, any rights of parents under the wrongful death statute are purely derivative, and the statute provides no "independent basis from which to derive such a right." *Kilminster*, 323 Or at 626. The question, then, is whether another statutory enactment abolishes a decedent's "right." In determining that question in *Kilminster*, the court apparently found a distinction between one statute that precluded negligence liability against public entities and employees that injured persons within the course and scope of employment and another statute that precluded negligence liability against employers that injured employees within the course and scope of employment. The critical distinction, as best we can discern it, was that there was something about the relationship between the employee and employer that permitted the legislature to abolish a "right" to recover under the wrongful death statute via ORS 656.018, but that such a relationship was lacking where ORS 30.265(3) "piggy backed" a grant of governmental immunity onto entities that were not employers. *Kilminster*, 323 Or at 627.

Although the court did not clarify exactly what was wrong with this "piggy backing," we must conclude that it was something about the nature of the relationship between employers and employees as set forth within the workers' compensation scheme that made it permissible for the legislature to abolish a right for parents to recover under the wrongful death statute for the death of children covered by workers' compensation law. We believe that the distinction the court must have had in mind was that the legislature made a legitimate policy choice to substitute one right, the right to participate in the no-fault workers' compensation scheme, for another right, the right to be compensated for certain injuries to the extent permitted by the wrongful death statute. *See also Evanhoff v. State Industrial Acc. Com.*, 78 Or 503, 154 P. 106 (1915) (recognizing the legitimacy of the legislature's choice to substitute the no-fault workers' compensation scheme for common-law tort liability). By comparison, the *Neher* defendants, being neither employers nor employees that participated in the trade-off represented by the workers' compensation scheme, were mere "piggy backers" onto the employers' immunity, seeking to reap a benefit from a bargain to which they were not parties.

On balance, we conclude that the Act at issue here more resembles the type of permissible trade-off of rights that the legislature is entitled to make, like the trade-off represented by the workers' compensation scheme, than it does the impermissible "piggy backing" of the immunity of public defendants at issue in *Neher*. The Act contains the following policy statement:

> "The Legislative Assembly hereby declares it is the public policy of the State of Oregon to encourage owners of land to make their land available to the public for recreational purposes, for woodcutting and for the harvest of special forest products by limiting their liability toward persons entering thereon for such purposes and by protecting their interests in their land from the extinguishment of any interest or the acquisition by the public of any right to use or continue the use of such land for recreational purposes, woodcutting or the harvest of special forest products." ORS 105.676.

The trade-off represented by this policy is manifest. The owner of land opened for recreational use in accordance with

the Act gives up exclusive enjoyment of the land and, in return, is insulated from certain types of liability for injuries that may occur there. The users of recreational lands opened in accordance with the Act give up their rights to sue land owners for certain types of injuries but gain the benefit of using land for recreation that otherwise would not be available to them. This Act does not permit the "piggy backing" that the court disapproved in *Neher* because it extends its protections and benefits only to those who are legitimate participants in the trade-off—the owners of the land who open their land under the terms of the Act and the users of the land who use the land for the purposes stated in the Act.

This reasoning comports with a number of earlier cases as well. In *Hale*, the court concluded that a legislative scheme that provided similar trade-offs passed constitutional muster by striking a "new balance * * * between municipal corporations and those to whom certain of those corporations could, under limited circumstances, formerly have been liable[.]" *Hale*, 308 Or at 523. The legislation at issue in *Hale* permitted suits against municipal corporations for torts, whether arising out of a governmental or proprietary function, but placed limitations on the amount to be recovered. *Id.* The court stated: "A benefit has been conferred, but a counterbalancing burden has been imposed. This may work to the disadvantage of some, while it will work to the advantage of others." *Id.* In *Sealey*, the question was whether a products liability statute of repose impermissibly denied injured parties a remedy in violation of Article I, section 10. The court acknowledged that the statute at issue "does bar plaintiff's claim and deny him a remedy for what would otherwise be a legally cognizable injury." *Sealey*, 309 Or at 393. However, the court concluded, based on earlier case law, that it is a "proper function of legislatures to limit the availability of causes of action by the use of statutes of limitation so long as it is done for the purpose of protecting a recognized public interest." *Id.* at 394, *quoting Joseph v. Burns & Bear*, 260 Or 493, 502, 491 P2d 203 (1971). It was a "permissible constitutional legislative function to balance the possibility of outlawing legitimate claims against the public need that at some definite time there be an end to potential litigation." *Id.*

In short, the Oregon Supreme Court's case law appears to recognize the legislature's ability to strike some

sort of balance between competing interests by redefining rights, including rights of action, even when such a redefinition alters or abolishes a remedy under some circumstances. The key would appear to be that there indeed has to be some sort of "balance," or legitimate trade-off, involved. The statutory scheme at issue in *Neher* failed because it attempted to confer a benefit on certain defendants but offered no corresponding benefit to the injured plaintiffs. By contrast, the exclusivity provision of the workers' compensation law at issue in *Kilminster* did strike a legitimate balance by eliminating certain tort claims for injuries to employees but substituting a no-fault compensation system. Likewise, a legitimate balance was struck in *Hale* by an enactment that expanded the scope of liability of municipal corporations but limited the amounts of recovery. In *Sealey*, the legitimate trade-off was the provision of a products liability cause of action for plaintiffs but one that included, for the public's interest, a time limitation for bringing such an action.

■ As is clear from *Sealey* and *Hale*, not every injury must be remedied by monetary compensation for a statutory scheme to pass muster under Article I, section 10. The workers' compensation scheme, for example, insulates employers from tort liability for certain injuries to employees, even if the injury turns out not to be deemed compensable by the workers' compensation law. *See Smothers v. Gresham Transfer, Inc.*, 149 Or App 49, 53-56, 941 P2d 1065 (1997), *rev allowed* 328 Or 40 (1998) (upholding this aspect of the workers' compensation law against Article I, section 10, challenge). Similarly, under *Sealey*, injuries caused by defective products after the expiration of the statute of repose are not remedied by monetary compensation. However, the legislation placing such limitations on causes of action nonetheless is permissible under Article I, section 10, because the legislature has the ability to alter causes of action by striking legitimate balances between competing interests.

The legislature has done so here, by permitting recreational landowners to limit their liability in the event that they choose to open their lands to the public for recreational purposes without charge. That legislative choice strikes an acceptable balance, by conferring certain benefits and certain

detriments on both the landowners involved, and on the recreational users of that land. We conclude that the Act does not violate Article I, section 10, of the Oregon Constitution.

Affirmed.

**LANDAU, P. J.,** concurring.

I join in the majority's analysis and disposition of this case. It has struggled thoughtfully and candidly with the existing case law concerning the scope and effect of the so-called "remedies clause" of Article I, section 10, and has developed a test that is consistent with at least most of the more recent cases construing the clause. To be sure, the majority's resolution cannot be reconciled with all of the applicable precedents. That is because the applicable precedents themselves cannot be reconciled. It is to explore that point that I write separately, in the hope that it may prompt some further reflection by the parties and by the courts.

The plain fact of the matter is that the case law construing Article I, section 10, is hopelessly confused. This is not an intemperate statement borne of disagreement with any particular case. It is the consensus of the scholarship. *See, e.g.,* Jonathan Hoffman, *By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions*, 74 Or L Rev 1279, 1282 (1995) ("The courts are in total disarray over how to interpret [the open courts clause]"); David Schuman, *Oregon's Remedy Guarantee: Article I, Section 10 of the Oregon Constitution*, 65 Or L Rev 35, 36 (1986) ("the remedy clause has not occasioned a coherent body of case law leading to anything that could be called an 'interpretation.'"). Indeed, it is the Oregon Supreme Court's assessment of its own cases. *See, e.g., Neher v. Chartier*, 319 Or 417, 423, 879 P2d 156 (1994) ("This court's case law throughout the nineteenth and twentieth centuries interpreting Article I, section 10, * * * has failed definitively to establish and consistently to apply any one theory regarding the protections afforded by the remedies guarantee.").

There is a reason for this state of affairs. It is that the courts have failed to examine the language of Article I, section 10, in either its linguistic or historical context. The

courts instead have *assumed* that the constitution guarantees a substantive remedy for wrongs committed. At the same time, the courts have been unwilling to accept the clear implication of their assumption, that the "remedies clause" effectively freezes substantive rights as they existed at the time the Oregon Constitution was adopted. As a result, the history of Article I, section 10, jurisprudence consists of the courts attempting to steer a course between their assumption that the clause guarantees a substantive remedy for wrongs committed and their commitment not to construe the clause to mean just that.

It has proven to be an impossible task. The courts simply cannot have it both ways. Either the clause guarantees a substantive remedy for wrongs committed or it does not. The courts nevertheless stubbornly persist in allowing the legislature to restrict remedies in some cases, *see, e.g., Kilminster v. Day Management Corp.*, 323 Or 618, 919 P2d 474 (1996) (legislature may provide immunity for claim for injury or death to person covered by workers' compensation law), but not in others, *see, e.g., Neher*, 319 Or at 426-28 (legislature may not provide that workers' compensation is the sole remedy for injury or death to person in course of employment when it does not actually produce a remedy), on remarkably similar facts. The distinctions that the courts have drawn to justify these disparate results have become simply untenable.

I respectfully suggest that the answer lies in returning to first principles and not in continuing to parse through the existing case law to articulate increasingly clever factual distinctions. The Supreme Court has identified an interpretive methodology for the construction of the Oregon Constitution. Its focus is the language of the constitution and its intended meaning by those who enacted it. *See Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992). I would apply that methodology. So doing would lead to the conclusion that the source of the problem is the court's *assumption* that Article I, section 10, was intended to function as a substantive remedies clause. The assumption is wrong. Neither the language nor the relevant history supports it. To the contrary, the language and history of Article I, section 10, establish that it was intended to function as an "open courts" clause, to

guarantee that everyone will have *access* to the courts to seek whatever remedies the law may provide, not as a guarantee that the law must provide a remedy.

I begin with the language of Article I, section 10, *in full*:

"No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

Examination of that language leads immediately to an important observation: What is commonly known as the "remedies clause" actually is only part of a complete sentence, the subject of which is not the creation of substantive rights but the prohibition of limitations on access to the courts. Thus, the target of Article I, section 10, is the courts, not the legislature.

The importance of the point cannot be overemphasized. The framers of the Bill of Rights knew well enough how to direct constitutional limitations to the legislature. Article I, section 8, for example, directs that "[n]o law shall be passed restraining the free expression of opinion * * *." It is plainly a limitation on the authority of the legislature to pass laws. Similarly, Article I, section 20, provides that "[n]o law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." Again, the focus is the legislature and its authority to pass laws. Other sections follow the same pattern. Article I, section 26, provides that "[n]o law shall be passed restraining any of the inhabitants of the State from assembling together * * *." Article I, section 29, provides that "[n]o law shall be passed granting any title of Nobility, or conferring hereditary distinctions." Article I, section 30, provides that "[n]o law shall be passed prohibiting emigration from the State." In each case, the focus on the powers of the legislature are made plain by the introductory phrase, "[n]o law shall be passed."

Article I, section 10, is different. It does not begin with the phrase "[n]o law shall be passed," rather, it begins

with the words "[n]o court shall." Plainly, the focus is not on the power of the legislature to enact laws, but on the power of *the courts*.

What are the limitations on the power of the courts? Article I, section 10, lists several. The courts may not "be secret." They must administer justice "openly and without purchase, completely and without delay." And, they must be open to "every man" to obtain "remedy by due course of law."

I am aware of the fact that Article I, section 10, consists of two independent clauses, the second of which begins "and every man shall have remedy by due course of law." But that clause cannot properly be read in a vacuum. It remains part of a single sentence and should be construed as such. Moreover, I note that the second clause, even taken by itself, does not guarantee to every man *a* remedy for *every* injury. It provides that every man "shall have remedy by due course of law," that is, every man shall have whatever remedy the "due course of law" provides. That is the only reading of the clause that is consistent with the subject of the sentence as a whole.

Thus, the focus of Article I, section 10, cannot be mistaken. It does not address the power of the legislature to enact laws generally, much less the power of the legislature to eliminate particular remedies for particular wrongs. Nor does it guarantee particular remedies for wrongs committed. It provides that every person shall find in the courts "remedy by due course of law."

From the text of Article I, section 10, therefore, it seems plain enough to me that the constitution was never intended to confer the right that the courts of this state long have assumed that it does. It guarantees *access*, not substantive rights.

The history of Article I, section 10, appears to bear out what its text so strongly suggests. Indeed, the Oregon Supreme Court already has noted that Article I, section 10, is rooted in colonial concerns for the integrity of, and free access to, the courts. In *Bryant v. Thompson*, 324 Or 141, 922 P2d 1219 (1996), the court addressed whether Article I, section

10, in requiring that "justice shall be administered * * * completely," means that post-conviction proceedings *must* be litigated to a conclusion before the state may execute a person convicted of a capital crime. After reviewing the history of the provision, the court concluded that Article I, section 10, was "intended to promote and protect an independent judiciary," not to require a particular remedy in every death-penalty case. *Id.* at 149.

In my view, the court was correct in *Bryant*. What is mystifying is how the court in one case can declare that, based on an examination of the historical sources, Article I, section 10, was never intended to guarantee a particular remedy, and in other cases adhere to the assumption that the constitution does precisely that.

Apparently, the court has divided Article I, section 10, into two distinct provisions. The first is an "open courts" provision, which the court applied in *Bryant*, and which the court concluded did not guarantee any particular substantive rights. The second is a "remedies" provision, which the court persists in concluding does guarantee, at least in some cases, particular substantive rights. The problem is that the history of the clause as a whole will not sustain such an artificial distinction. Both clauses of Article I, section 10, are rooted in the same history.

The language of Article I, section 10—*both* clauses—derives principally from Lord Edward Coke's *Second Institutes*, in the portion that comments on the Magna Carta. Article 40 of the Magna Carta had proclaimed that "[t]o none will we sell, to none deny or defer, right and justice." Coke expounded on Article 40 as follows:

> "And therefore every Subject of this Realm, for injury done to him in bonis, terris, vel persona [goods, lands, or person], by any other subject, be he Ecclesiastical, or Temporal, Free or Bond, Man or Woman, Old or Young, or be he outlawed, excommunicated, or any other without exception, may take his remedy by the course of the law, and have justice and right for the injury done him, freely without sale, fully without denial, and speedily without delay."

Lord Edward Coke, *The Second Part of the Institutes of the Lawes of England*, 55-56 (1642). Coke wrote not merely to

explain Magna Carta but also to support a lifelong fight against the Crown's interference with the work of the common-law courts. His concerns, in particular, were the corruption of the courts, the sale of judicial offices, and the partiality of judicial decisions.

In that regard, Coke's language deserves more careful scrutiny. I note especially that his focus was not on the guarantee of any particular substantive right but on the availability of impartial justice to "every Subject of this Realm." According to Coke, "every Subject * * * may take his remedy by the course of the Law." But the emphasis is not on the "remedy." Instead, it is the fact that such remedy as the "due course of the Law" affords is available to *"every Subject * * * be he Ecclesiastical, or Temporal, Free or Bond, Man or Woman, Old or Young, or be he outlawed, excommunicated, or any other without exception."* (Emphasis added.)

Similar concerns occupied lawyers in colonial America, who faced repeated interference with their courts by the Crown. Not surprisingly, those lawyers, well aware of Coke's *Institutes* and the conditions that engendered them, looked to him in expressing their concerns. Resort to Coke first found expression in the Delaware Constitution of 1776, which provides:

> "That every freeman for every injury done him in his goods, lands or person, by any other person, ought to have remedy by the course of the law of the land, and ought to have justice and right for the injury done to him freely without sale, fully without any denial, and speedily without delay, according to the law of the land."

Del Decl of Rights, Art XII (1776). That this provision was addressed to open access and not to any limitation of the legislature's authority was confirmed by other provisions of the constitution, among them one that expressly adopted the common law of England "unless they shall be altered by a future law of the Legislature." Del Const of 1776, Art 25. Other states followed suit, enacting variations on the same theme. Oregon's Article I, section 10, plainly is patterned after such provisions as Delaware's, although the precise language is slightly different.

I have found nothing in the history of Article I, section 10, or its counterparts in any of the 35 other state constitutions that contain similar provisions, suggesting an intention to guarantee a right to a particular remedy. What seems clear to me is that, in light of Coke's concerns expressed in his famous *Institutes*, and in light of the similar concerns of the framers of early state constitutions, the language that made its way into Article I, section 10, historically was understood to guarantee open access to a fair and impartial court, not to guarantee that the legislatures would not alter the substance of rights and remedies in the future. Thus, the relevant history simply will not support the practice of the Oregon courts in treating the language of Article I, section 10, as two separate provisions, one assuring an open and impartial court and the other ensuring a remedy for every wrong.

I hasten to add that neither the analysis nor the conclusion that I assert is particularly revolutionary. The history of Article I, section 10, for example, has been noted by other courts and is set out in various scholarly works. Particularly enlightening is Hoffman's excellent *By the Course of Law: The Origins of the Open Courts Clause of State Constitutions*, 74 Or L Rev 1291 (1995). Indeed, a number of other states have consulted the language and history of their similarly worded open courts provisions and concluded that they guarantee only access, not substantive rights. The comments of the Supreme Court of Montana in *Stewart v. Standard Pub. Co.*, 102 Mont 43, 55 P2d 694, 696 (1936), are representative:

> "A reading of the [state remedy clause] discloses that it is addressed exclusively to the courts. The courts are its sole subject matter, and it relates directly to the duties of the judicial department of the government. It means no more nor less than that, under the provisions of the Constitution and laws constituting them, the courts must be accessible to all persons alike, without discrimination, at the time or times, and the place or places, appointed for their sitting, and afford a speedy remedy for every wrong recognized by law as being remediable in court."

*See also Quesnel v. Town of Middlebury*, 167 Vt 252, 258, 706 A2d 436, 439 (1997) (state open courts clause "does not create substantive rights * * * it merely provides access to the courts"); *Crier v. Whitecloud*, 496 So 2d 305, 309-10 (La 1986)

("From this history [of the state open courts clause] we conclude that * * * the Constitutional Convention did not intend to limit the legislature's ability to restrict causes of action or to bar the legislature from creating various forms of statutory immunity from suit. * * * The constitutional guarantee providing for open courts and insuring a remedy for injuries does not warrant a remedy for every injury."); *Andrews v. O'Hearn*, 387 NW2d 716, 723 (ND 1986) ("[o]ur research shows that [the open courts clause of the state constitution] has been repeatedly construed as a guarantee of access to our State system of justice"); *Singer v. Sheppard*, 464 Pa 387, 400, 346 A2d 897, 903 (1975) ("nothing in [the state constitution] prevents the legislature from extinguishing a cause of action"); *Nash v. Baker*, 522 P2d 1335, 1338 (Ok 1974) (state open courts clause "does not promise a remedy to every complainant * * * [i]t does not prevent the Legislature from creating new legal rights * * * or from increasing or reducing or changing the scope of such a right or the remedy for its violation").

Certainly, not all states have arrived at the same conclusion. *See generally* David Schuman, *The Right to a Remedy*, 65 Temple L Rev 1197 (1992) (categorizing various state interpretations of open courts clauses). But those states tend not to be as committed to a method of state constitutional interpretation that emphasizes the text of a provision and its intended meaning as Oregon is under *Priest*. Moreover, a substantial number of those other states also rely on "balancing," holding that although the open courts clauses may have some substantive content, it is subject to reasonable legislative qualification, an approach that generally is considered anathema to Oregon constitutionalism.

Of course, as the Court of Appeals, we are not free simply to wipe the proverbial slate clean of all existing precedent and start with a fresh examination of the text and history of Article I, section 10. Only the Supreme Court can reexamine its assumptions about the meaning and effect of that constitutional provision. Perhaps this case will provide an opportunity for the court to do so. In the meantime, I support the majority's opinion, which does the best that can be done with the law as we must accept it.

Linder, J., joins in this concurrence.