Argued and submitted February 19, 1999, reversed and remanded on appeal; affirmed on cross-appeal May 31, both petitions for review allowed November 7, 2000 (331 Or 283)
See later issue Oregon Reports

Nancy J. STORM,
personal representative for the Estate of
Jon E. Storm, deceased,
*Respondent - Cross-Appellant,*
*v.*
Rick McCLUNG,
*Cross-Respondent,*
*and*
CITY OF OREGON CITY,
a municipal corporation,
*Appellant - Cross-Respondent.*
(CCV9605004; CA A99618)
4 P3d 66

Robert E. Franz, Jr., argued the cause and filed the briefs for appellant - cross-respondent City of Oregon City and cross-respondent Rick McClung.

W. Eugene Hallman argued the cause and filed the brief for respondent - cross-appellant.

Before Edmonds, Presiding Judge, and Armstrong and Kistler,* Judges.

ARMSTRONG, J.

---

* Kistler, J., *vice*, Warren, P. J., retired.

.

## ARMSTRONG, J.

Plaintiff, the widow of Jon Storm and personal representative of his estate, brought this wrongful death action against the City of Oregon City (the City) for the benefit of Storm's mother, Myrtha Storm, and his daughters, Sonia and Tami Storm. ORS 30.020. The City appeals from a judgment for plaintiff that was based on the jury's finding that the City and Storm were each 50 percent negligent in Storm's death. We hold that Sonia and Tami have each received a substantial remedy under the Workers' Compensation Law and that plaintiff is not, therefore, entitled to any recovery on their behalf. We therefore reverse and remand for retrial on the issue of damages solely on behalf of Myrtha.

Storm was an employee of Bud's Towing, an Oregon City business owned by Del Bullock.[1] Bullock was active in civic affairs, at times loaning his business equipment and employees for city projects. Storm was similarly involved; among other things, he was a member of the Arbor Day Clean Up Committee, which Rick McClung, the City's director of public works, chaired.[2] The members of the committee other than McClung were, like Storm, volunteers interested in the "beautification and enhancement of the city."

Storm died on May 4, 1994, in the process of an Arbor Day project at the City's Clackamette Park, which is located at the confluence of the Clackamas and Willamette rivers. The city wanted to top a number of cottonwood trees in the park, both because the trees were potentially dangerous and to create nesting sites for birds. It had previously paid a

---

[1] We base this summary of the facts on our review of the record, assisted by plaintiff's helpful statement in her brief. In its brief, the City fails either to describe the facts most favorably to the jury's verdict or to do so in narrative form. Rather, it summarizes each witness' testimony *seriatim*, requiring the court to attempt to determine the relationship between the events that the various witnesses described. In the first respect the City fails to comply with the appropriate standard of review. In the second, it violates both ORAP 5.40(8) and the basic principles of effective appellate practice. *See Myers v. Cessna Aircraft*, 275 Or 501, 506 n 2, 553 P2d 355 (1976); *State ex rel Kilian v. City of West Linn*, 112 Or App 549, 554 n 3, 829 P2d 1029, *rev den* 314 Or 391 (1992).

[2] McClung is also a defendant. The court's order dismissing the claims against him is the subject of plaintiff's cross-appeal; we affirm that order without discussion.

professional tree service to fell a number of trees in the park; city employees did not believe that they were qualified to do the work safely. The jury could have found that topping a tree is more dangerous than felling it. A city employee examined the trees in April 1994 and identified six that were particularly dangerous because of their location and condition. The City knew from the employee's written report that tree "F" contained rotten wood, which increases the dangerousness of a cottonwood. McClung suggested that the Arbor Day committee include topping those six trees among the projects for its spring clean-up period, which ran for several weeks in May and June. If the City had been unable to find volunteers, either through the committee or otherwise, it would again have hired a contractor; its own employees would not have done the job.

Storm was one of the volunteers who worked on topping the trees. Bud's Towing provided equipment for use on the job. Bullock was present for only a small part of the time, but Storm participated throughout the day. The equipment that Bud's Towing provided included a crane that had a bucket at one end; of those present, only Storm and Bullock were qualified to operate it. Michael Huffman, the person cutting the trees, stood in the bucket 30 feet above the ground in order to top the trees. Storm did not originally do any of the cutting because he had to operate the crane. After the group successfully topped several trees, it turned to tree "F." After Huffman had cut a significant distance through the trunk of that tree, the top began to move toward him, rather than away from him. The movement ultimately trapped the saw within the cut. Huffman shut off the saw, and the group spent about an hour discussing what to do next. Bullock arrived during the discussion.

The group ultimately decided that Storm would go up in the bucket, at least to retrieve the saw and see exactly what the situation was, while Bullock operated the crane. Storm went up, pounded wedges into the saw cut, and freed the saw. Instead of coming down at that point, he started the saw and attempted to finish topping the tree. The top again moved toward the saw rather than away from the crane, but this time it came completely down. In doing so, the top knocked the crane off the truck, threw Storm out of the

bucket, and landed on top of him. Storm died soon afterwards. City employees observed and videotaped the entire proceedings, but they were not involved in the decisions and did not warn Storm or anyone else of the dangers that the trees presented.

The jury found that Storm and the City were each 50 percent negligent in causing Storm's death. There is evidence that supports that finding. The jury then determined that the estate's economic damages were $147,923 and that its noneconomic damages, on behalf of Tami, Sonia and Myrtha, were $400,000. In accordance with the jury's finding of comparative fault, the court entered judgment against the City for $73,961.50 in economic damages and $200,000 in noneconomic damages. It thereafter entered an order of distribution under ORS 30.050, apportioning economic damages of $24,653.83 each to Sonia and Tami and $24,653.84 to Myrtha, and noneconomic damages of $75,000 each to Sonia and Tami and $50,000 to Myrtha.

■ The City makes a number of assignments of error, most of which do not require extended discussion. Its argument that the court erred in submitting the specifications of negligence to the jury is based on the City's view of the evidence, not on the view that plaintiff wanted the jury to take, that it apparently did take, and that the evidence permitted. The City also objects to the court's giving instructions that the City originally requested on its obligations to a licensee and an invitee. The City, not unnaturally, does not assert that those instructions are incorrect statements of the law. Contrary to its current position, the instructions remained appropriate even though the City withdrew its requests after the close of the evidence.[3] Under defendant's theory of the case, Storm was a licensee who came into the park for a project that the City permitted but did not sponsor or encourage; under plaintiff's theory of the case, Storm was an invitee who

_____

[3] It is not clear why the court gave the instructions after the City withdrew its request. According to plaintiff's brief, she did not request them. However, defendant's counsel, before stating his exceptions to the instructions, said that plaintiff had requested them after he withdrew his request. Because the discussion concerning instructions apparently occurred in chambers and, as too often happens, was not reported, we cannot resolve that conflict.

at the time of his death was voluntarily working on the City's business, at the City's request, on the City's land.

■ The City also assigns error to the denial of its motions for directed verdict based on the Recreational Land Act, *former* ORS 105.655 to ORS 105.680, *repealed by* Or Laws 1995, ch 456, § 9, and the Woodcutting Act, *former* ORS 105.685 to ORS 105.697, *repealed by* Or Laws 1995, ch 456, § 9. Both acts provided significant immunity from tort claims to landowners who permitted or invited persons to come onto their land for recreational purposes or in order to cut and remove wood. The problem with the City's position is the same under both statutes: under the evidence, viewed most favorably to plaintiff, Storm was not simply a person invited or permitted to enter the City's land. Rather, he was present at the City's request, with the City's assistance, in order to benefit the City. He was not a person described in either act, and they therefore do not apply to this case.

The remaining assignments of error involve, directly or indirectly, the relationship between the Tort Claims Act and the Workers' Compensation Law. The issues arise from ORS 30.265(3)(a), which is part of the Tort Claims Act. That statute provides immunity from liability to every "public body and its officers, employees and agents acting within the scope of their employment or duties" for "[a]ny claim for injury to or death of any person covered by any workers' compensation law." The statute applies to this case, because at the time of his death Storm was covered by workers' compensation as an employee of Bud's Towing. Plaintiff, in her capacity as Storm's wife rather than as personal representative of his estate, and Sonia and Tami, as Storm's daughters, have received workers' compensation benefits. The record does not indicate that Myrtha received anything. Plaintiff, in her capacity as Storm's wife, recognizes that the benefits that she has received bring her within the prohibition of ORS 30.265(3)(a) and, therefore, does not make any claim on her own behalf.

ORS 30.265(3)(a) affects the City's assignments of error that the trial court erred in submitting certain elements of damage to the jury and that it erred in denying the City's motion for a directed verdict as to plaintiff's claims on

behalf of Sonia and Tami. Those assignments also relate to the nature of the damages that the Wrongful Death Act permits plaintiff, as personal representative of Storm's estate, to seek. Under ORS 30.020(2) wrongful death damages are limited to an amount that:

"(a)   Includes reasonable charges necessarily incurred for doctors' * * * [and] other medical services, burial services and memorial services rendered for the decedent;

"(b)   Would justly, fairly and reasonably have compensated the decedent for disability, pain, suffering and loss of income during the period between injury to the decedent and the decedent's death;

"(c)   Justly, fairly and reasonably compensates for pecuniary loss to the decedent's estate;

"(d)   Justly, fairly and reasonably compensates the decedent's spouse, children, * * * and parents for pecuniary loss and for loss of the society, companionship and services of the decedent; and

"(e)   [Punitive damages]."

The normal application of ORS 30.265(3)(a) is to prevent the estate from recovering *any* of the damages that the statute describes, including those on behalf of the decedent's relatives, when the decedent is covered by a workers' compensation law. However, the Supreme Court has held that that limitation violates Article I, section 10, of the Oregon Constitution,[4] when applied to someone who does not receive a substantial remedy from the workers' compensation system. In *Neher v. Chartier*, 319 Or 417, 879 P2d 156 (1994), the plaintiff's daughter was killed when a Tri-Met bus struck her while she was in a marked crosswalk and the "walk" signal was in her favor. She was in the course and scope of her employment at the time. Because she had no dependents, the only workers' compensation benefits to which anyone was entitled as a result of her death was a maximum $3,000 for burial expenses, payable to her estate. The plaintiff, as personal representative of her estate, sued the bus driver and

---

[1] Article I, section 10, provides in relevant part that "every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

Tri-Met for her injuries. The trial court dismissed the case on the ground that ORS 30.265(3)(a) made both Tri-Met and the driver immune.

On appeal, the Supreme Court held that the application of ORS 30.265(3)(a) to that case was unconstitutional. After discussing its previous cases concerning the right to a remedy under Article I, section 10, the court concluded that legislation extending tort immunity to public officers and employees violates the constitution "if the effect of the immunity provisions is to render tort plaintiffs 'without remedy.' " *Neher*, 319 Or at 426. Although the decedent's estate was not entirely without a remedy because of the burial benefit, the estate was not the only real party in interest in a wrongful death action. Under ORS 30.020(1), the estate brings the action on behalf of others that include the decedent's surviving spouse, children, and parents. ORS 30.020(2)(d) entitles those people to compensation "for pecuniary loss and for loss of the society, companionship and services of the decedent." In *Neher*, however, the workers' compensation system left the decedent's parents entirely without a remedy. It abolished their remedy not only against the public body but also against the public body's negligent employees. That, the court concluded, was inconsistent with its previous cases under Article I, section 10. *Id.* at 427-28.

The court summarized its holding in *Neher* at the end of its opinion:

> "ORS 30.265(3)(a), which provides that public bodies and their officers, employees, and agents, acting within the scope of their employment are immune from liability for claims for injury to or death of any person covered by any workers' compensation law, violates Article I, section 10, of the Oregon Constitution, because it has left plaintiff without a remedy."

319 Or at 428. We have had only one previous occasion to apply the holding in *Neher*.[5] In *Brentano v. Marion County*, 150 Or App 538, 946 P2d 705 (1997), the plaintiff argued, based on the Supreme Court's introductory and concluding

---

[5] We recently discussed *Neher* in *Brewer v. Dept. of Fish and Wildlife*, 167 Or App 173, 2 P3d 418 (2000), concluding that it remains controlling in this precise context. *Id.* at 187-88.

statements in *Neher*, that the court had held that ORS 30.265(3)(a) is unconstitutional in all situations. We examined the *Neher* decision and concluded that the plaintiff was wrong. Rather, we held, the court had limited its holding to the facts of the case, in which the parents were *wholly* without a remedy. We noted that the court had held in *Hale v. Port of Portland*, 308 Or 508, 523, 783 P2d 506 (1989), that the liability limits of the Tort Claims Act did not violate Article I, section 10, because that act provided a substantial remedy, even if one that was not as great as the tort system would otherwise allow. We therefore concluded that ORS 30.265(3)(a) is unconstitutional only to the extent that the workers' compensation system does not provide the plaintiff a substantial remedy. In *Brentano*, the plaintiff received $35,000 from the workers' compensation system, which we held was a substantial remedy.

■  Plaintiff argues that ORS 30.265(3)(a) is unconstitutional as to plaintiff's claims on behalf of Sonia and Tami, each of whom at the time of trial had received workers' compensation benefits of over $5,000 ($5,412.50 for Tami and $5,660.60 for Sonia), and each of whom is entitled to an additional $215 for every month that she attends college. Plaintiff argues that those amounts are not substantial in light of the jury's determination that each daughter suffered total damages of $199,306 and of the judgment that awarded each daughter a total of $99,653. That argument, of course, relies on the benefit of hindsight after trial and ignores that the court, not the jury, allocated the total verdict among the various beneficiaries. There is, however, a more basic problem with plaintiff's position.

At the heart of plaintiff's argument is her assumption that all that is relevant to determining the substantiality of a remedy is comparing the amount that the plaintiff could have recovered in a tort action with the amount that the beneficiary received from the workers' compensation system. That assumption does not directly flow from the relevant decisions, which appear to focus more on the absolute amount of the alternative recovery. In *Brentano*, we noted that the plaintiff had received $35,000 in workers' compensation benefits. We did not describe the extent of the plaintiff's injuries, whether the benefits were for wage loss, medical services, or other purposes, or the amount that the

plaintiff might have recovered in a tort action. We simply held that the amount that he received was a substantial remedy and that, for that reason, the statute was not unconstitutional as applied to him. Similarly, in *Hale*, which it decided before *Neher*, the Supreme Court determined that the limit of $100,000 that the Tort Claims Act then provided was a substantial remedy, even though that amount was only about a sixth of the plaintiff's actual medical bills. The court held that Article I, section 10, does not require that the remedy that the legislature provides must be precisely of the same type or extent; it is enough if the remedy is a substantial one. *Hale*, 308 Or at 523.

Those cases do not resolve the issue, however. Exactly what makes an alternative remedy "substantial" for purposes of Article I, section 10, is not entirely clear. The cases contain only bald statements that a certain amount is or is not substantial, with no significant analysis to support their conclusion. There are, however, some resources to help flesh out these statements. Because the issue is the meaning of a word, we begin with the dictionary. The relevant definitions suggest that, to be substantial, something must at least be significant, either in absolute terms or in relationship to what the word describes. Those definitions include "considerable in amount, value, or worth ‹made a [substantial] gain on the transaction›"; "being that specified to a large degree or in the main ‹a [substantial] victory› ‹a [substantial] lie›"; and "of or relating to the main part of something[.]" *Webster's Third New Int'l Dictionary*, 2280 (unabridged ed 1993). Under the first definition, a remedy may be substantial if it is large in an absolute sense; that would be consistent with the holdings in *Hale* and *Brentano* and with at least some of their reasoning. The second and third definitions, however, imply that a substituted remedy must be substantial in relationship to the previous remedy, which supports plaintiff's assumption.

Some cases, however, appear to suggest a criterion that is not in the dictionary. They hold that whether a substituted remedy provides a benefit as well as a detriment may be more important to its substantiality than either its absolute or relative size. In *Hale*, the court noted that the legislature, in adopting the Tort Claims Act, had struck a new balance between municipal corporations and those to whom

the corporations could have been liable before the adoption of the act: it both *limited* the amount of a municipality's liability and *widened* the class of plaintiffs to whom municipalities could be liable by abolishing the distinction between proprietary and governmental functions. "A benefit has been conferred, but a counterbalancing burden has been imposed. This may work to the disadvantage of some, while it will work to the advantage of others. But all who had a remedy continue to have one." *Hale*, 308 Or at 523. The court had previously taken similar positions under Article I, section 10, with regard to the Workers' Compensation Law, which substitutes a certain but relatively small remedy for an uncertain but potentially large one, *see Evanhoff v. State Industrial Acc. Com.*, 78 Or 503, 523-24, 154 P 106 (1915), and ORS 30.160, which limits the damages recoverable in a defamation action if the defendant publishes a correction or retraction. *See Davidson v. Rogers*, 281 Or 219, 222, 574 P2d 624 (1978). In each case, the plaintiff will receive a remedy that is qualitatively different from that available under the common law but that, the court has held, satisfies the constitutional requirement. The fact that for some plaintiffs the substituted remedy will be superior to the original remedy appears to be important. In *Hale*, which first treated the issue as whether the substituted remedy was "substantial," that qualitative superiority appears to be part of what made the new remedy substantial.

Finally, in *Neher* the court noted that ORS 30.010 recognizes a right of recovery on behalf of surviving relatives "for pecuniary loss and for loss of the society, companionship and services of the decedent" and that the adoption of ORS 30.265(3)(a) left the decedent's parents without the ability to recover for those losses against anyone—and, thus, without a remedy of any sort. 319 Or at 428. Because nondependent parents are not entitled to any workers' compensation death benefits, *see* ORS 656.204, there was no issue in *Neher* of whether the workers' compensation benefits themselves constituted a substantial remedy. Thus, among other things, the court did not need to decide whether the failure of the workers' compensation system to provide compensation for the loss of the decedent's society and companionship affected the substantiality of the remedy.

■       Those cases lead us to some tentative conclusions. First, it appears to be acceptable under Article I, section 10, to eliminate any compensation for noneconomic damages, such as loss of society and companionship, provided that there continues to be some source of compensation for economic damages. Second, the substituted remedy must provide some benefit to the class of potential plaintiffs in addition to simply eliminating or reducing the previous remedy. The benefit may be different in quality from the previous remedy, but it must exist. The workers' compensation system, which eliminates all right to recover for noneconomic damages but provides compensation for economic injuries without the necessity of proving fault, is the classic example of these first two conclusions. The Tort Claims Act, which eliminates the distinction between proprietary and governmental functions in exchange for a limitation on the total amount recoverable from a public body, is an example of the second conclusion. Finally, the substituted remedy must only be substantial; it need not be equivalent to the previous remedy, even for the same kind of injuries. Thus, comparing the amount actually available under the workers' compensation system with a potential tort recovery is inappropriate. The question is whether the amount actually recovered is substantial.

        We have some difficulty in applying these conclusions to this case. Plaintiff's recovery was against the City, while Sonia and Tami received workers' compensation benefits through Storm's employment with Bud's Towing. ORS 30.265(3)(a), in essence, uses the remedy that the workers' compensation law provides against Storm's employer to deny Sonia and Tami a remedy against a third party who would otherwise be liable. There is no obvious substitute remedy for them, or other potential plaintiffs in their situation, in exchange for the loss of their tort remedy against the City. Nevertheless, *Neher* and, more expressly, *Brentano* appear to suggest that that is acceptable, so long as the workers' compensation remedy is otherwise substantial. In any event, plaintiff defends the denial of the City's motion for directed verdict solely on the ground that the *amounts* that Sonia and Tami received are not substantial; she does not argue that

denying her any remedy against the City is itself a constitutional violation. We will therefore decide the issue that the parties raise.

We conclude that Sonia and Tami each received a substantial remedy from the workers' compensation system. Each has already received over $5,000 and, depending on how far each pursues her schooling, each may ultimately receive over $10,000. The nature of the workers' compensation system allowed them to recover without regard to whether Storm's negligence was the primary cause of his death, something that, as the jury's verdict shows, was a close question. That trade-off justifies a smaller recovery than the tort system would provide because the recovery is certain. In addition, the recovery is based on a formula that is related to the monetary contribution that Storm would have made if he had lived, and the amounts themselves are not insignificant. In reaching this conclusion, we determine substantiality without considering the jury's verdict, because the issue is how the statute treats the entire class of potential plaintiffs. The fact that the jury might well have concluded that Storm's negligence was greater than 50 percent and, thus, have awarded nothing, illustrates the importance of that approach. Because these amounts were substantial, applying ORS 30.265(3)(a) to Sonia and Tami would not violate Article I, section 10. The trial court should have granted the motions for partial directed verdicts as to them.

■ The last issues involve the trial court's instructions permitting the jury to award plaintiff reasonable and necessary hospital and medical service and burial expenses and instructing the jury that plaintiff could recover any pecuniary loss to Storm's estate. Each of those instructions is inconsistent with ORS 30.265(3)(a). Medical and burial expenses are damages that the estate suffered directly. The authority to recover them comes from ORS 30.020(2)(a) and (c). They are not part of compensating Storm's surviving relatives for their loss under ORS 30.020(2)(d). The Tort Claims Act, thus, forecloses the estate from recovering them. On the retrial the court should not instruct the jury concerning those damages.

■■ The evidence on which the jury based its award of damages involved all three claimants, Myrtha, Sonia and

Tami. Because the court erred in submitting Sonia's and Tami's claims to the jury, and because the jury considered that improper evidence in reaching its verdict, we cannot affirm the entirety of the jury's award. There is nothing in the record that would permit us to determine what the jury would have awarded if the evidence had been limited to Myrtha's claim. Although the trial court allocated the damages among Myrtha's, Sonia's and Tami's claims, that allocation was based on the court's authority under ORS 30.050. It does not purport to reflect a jury determination. Because the record does not allow us to remand for entry of a judgment for a specific amount, there must be a retrial. On the other hand, because we reverse only on damage issues, and because none of those issues could have affected the jury's determination of liability, we limit the remand to a retrial on the amount of damages that plaintiff is entitled to recover under ORS 30.020(2)(d) on behalf of Myrtha Storm. *See Turnbow v. K.E. Enterprises, Inc.*, 155 Or App 59, 72-73, 962 P2d 764 (1998).

On appeal, reversed and remanded for new trial on damages on behalf of Myrtha Storm only; affirmed on cross-appeal.